FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2014 JUL 29 ⊓ 4: 34

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| ALL ASSETS | ) |
| LISTED IN ATTACHMENT A, | ) |
| AND ALL INTEREST, BENEFITS, | ) |
| AND ASSETS TRACEABLE THERETO, | ) |
| | ) |
| **Defendants *in Rem*.** | ) |
| | ) |

Civil Action No.: *1:14cv969*

*LOG/TRJ*

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Comes now the Plaintiff, United States of America, through its undersigned attorneys,

and alleges as follows:

### NATURE OF THE ACTION

1.      The United States brings this action in rem seeking the forfeiture of all right, title,

and interest in all assets listed in Attachment A, and all property traceable thereto (collectively,

the "Defendant Properties").

2.      The United States' claims arise from a scheme by the "Mega Conspiracy" — an

international criminal enterprise run by Kim Dotcom, Finn Batato, Julius Bencko,

Sven Echternach, Mathias Ortmann, Andrus Nomm, Bram van der Kolk, and business entities

Megaupload Limited and Vestor Limited — to engage in criminal copyright infringement on a

massive scale and launder the proceeds.

3.      As set forth below, the Defendant Properties constitute the proceeds of the

conspiracy's criminal copyright infringement, property used or intended to be used to commit or

facilitate the commission of a criminal copyright offense and property involved in the laundering

of such proceeds, and are therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C), 985, and 2323(a)(1).

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over actions commenced by the United States under 28 U.S.C. § 1345, and over forfeiture actions under 28 U.S.C. § 1355(a).

5.      This Court has *in rem* jurisdiction over the Defendant Properties under 28 U.S.C. § 1355(b)(2) because they are located in foreign countries, or have been detained and seized pursuant to competent authority of foreign governments.

6.      Venue is proper within this judicial district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia, and under 28 U.S.C. § 1355(b)(1)(B) and 18 U.S.C. § 981(h) because a criminal prosecution has been brought in this District based on the violations that are the bases for forfeiture.

## FACTUAL ALLEGATIONS

### I.     Relevant Persons and Entities

7.      Kim Dotcom, who has also been known as "Kim Schmitz" and "Kim Tim Jim Vestor," is a resident of both Hong Kong and New Zealand, and a dual citizen of Finland and Germany. Dotcom is the founder of Megaupload Limited ("MUL") and Megamedia Limited ("MMG"). Until on or about August 14, 2011, Dotcom was the Chief Executive Officer for MUL, and was, at the time of the Mega Conspiracy's takedown on or about January 20, 2012, MUL's Chief Innovation Officer. As the head of the Mega Conspiracy, Dotcom employed more than 30 people residing in approximately nine countries. From the onset of the Mega Conspiracy through to January 20, 2012, Dotcom supervised the development of the websites and companies utilized in the Mega Conspiracy. Dotcom directed the creation of the network infrastructure

behind the Mega Conspiracy websites, negotiated contracts with Internet Service Providers and advertisers, administered the domain names used by the Mega Conspiracy, and exercised ultimate control over all decisions in the Mega Conspiracy. Dotcom has arranged millions of dollars in payments for the computer servers utilized by the MUL and MMG properties around the world, and has also distributed proceeds of the Conspiracy to his co-conspirators. Dotcom is the director and sole shareholder of both Vestor Limited and Kingdom International Ventures Limited, which have been used to hold his ownership interests in MUL– and MMG–related properties; for example, Dotcom owns approximately 68% of Megaupload.com, Megaclick.com, and Megapix.com, and 100% of the registered companies behind Megavideo.com, Megaporn.com, and Megapay.com, through Vestor Limited. Dotcom has personally distributed a link to a copy of a copyrighted work on, and has received at least one infringing copy of a copyrighted work from, the Mega Sites. Additionally, on numerous occasions, Dotcom received copyright infringement takedown notices from third-party companies submitted pursuant to the Digital Millennium Copyright Act ("DMCA"). These copyright infringement takedown notices identify the copyrighted work that has been infringed, its location, and the owner. In calendar year 2010 alone, Dotcom received more than $42 million from the Mega Conspiracy.

8.      Megaupload Limited was the registered owner of Megaupload.com, the primary website operated by the Mega Conspiracy, and Megaclick.com, a site that offered advertising associated with Mega Conspiracy properties. MUL is a registered company in Hong Kong with a registry number of 0835149. MUL has a number of bank accounts in Hong Kong that have been used to facilitate the operations of the Mega Conspiracy. Dotcom, in addition to holding the title of Chief Executive Officer of MUL until as recently as August 2011, owned, through Vestor Limited, approximately 68% of the shares of MUL; Mathias Ortmann, through Netplus

International Limited LLC, owned an additional 25%; Julius Bencko, through Basemax International Limited, owned 2.5%; Bram Van der Kolk utilized Mindpoint International Limited LLC to hold 2.5% of the shares of MUL; Sven Echternach owned approximately 1%; and the remaining 1% was owned by an investor in Hong Kong.

9.     Vestor Limited is a registered company in Hong Kong with a registry number of 0994358. Vestor Limited has a DBS Bank account in Hong Kong that has been used to facilitate the operations of the Mega Conspiracy. Dotcom (under the alias Kim Tim Jim Vestor) is the sole director and shareholder of Vestor Limited, and thus is effectively the sole director and 68% owner of MUL, Megaupload.com, Megaclick.com, and Megapix.com. Dotcom is the sole director of, and Vestor Limited is the sole shareholder of, MMG, which is the parent company and sole shareholder of the following companies: Megavideo Limited (which was the registered owner of Megavideo.com), Megarotic Limited (which was the registered owner of Megaporn.com), and Megapay Limited. Vestor Limited was also the sole owner of Megaworld.com.

10.     Finn Batato is both a citizen and resident of Germany. Batato was the Chief Marketing and Sales Officer for Megaupload.com and other Mega Conspiracy properties. Specifically, Batato was in charge of selling advertising space, primarily through Megaclick.com. Batato supervised a team of approximately ten sales people around the world. The purpose of the sales team was to increase the advertising revenue in localized markets by targeting certain advertisements in certain countries. Batato handled advertising customers on the Megaclick.com website and approved advertising campaigns for Megaupload.com, Megavideo.com, and Megaporn.com. Batato personally distributed a link to at least one infringing copy of a copyrighted work to a Mega Site. Additionally, on numerous occasions, Batato received DMCA

copyright infringement takedown notices from third-party companies. In calendar year 2010, Batato received more than $400,000 from the Mega Conspiracy.

11.     Julius Bencko is both a citizen and resident of Slovakia. Bencko was the Graphic Director for MUL and MMG. Bencko, as the director and sole shareholder of Basemax International Limited, was effectively a 2.5% shareholder of MUL. From the onset of the Conspiracy through to January 20, 2012, Bencko was the lead graphic designer of the Megaupload.com and other Mega Conspiracy websites. He designed the Megaupload.com logos, the layouts of advertisement space, and the integration of the Flash video player. Bencko requested and received at least one infringing copy of a copyrighted work as part of the Mega Conspiracy. In calendar year 2010, Bencko received more than $1 million from the Mega Conspiracy.

12.     Sven Echternach is both a citizen and resident of Germany. He was the Head of Business Development for MMG and MUL. Echternach was a 1% shareholder in MUL. He led the Mega Team company, registered in the Philippines, which was tasked with removing illegal or abusive content from the Mega Conspiracy websites. The Mega Team company (the "abuse team") was instructed not to remove infringing content, but instead to tag it in a manner that it would be more difficult for rightsholders to identify. Additionally, Echternach handled the Mega Conspiracy's relationships with electronic payment processors, accounting firms, and law firms. His activities included traveling and approaching companies for new business ventures and services. Additionally, on numerous instances, Echternach received DMCA copyright infringement takedown notices from third-party companies. In calendar year 2010, Echternach received more than $500,000 from the Mega Conspiracy.

13. Mathias Ortmann is a citizen of Germany and a resident of both Germany and Hong Kong. Ortmann was the Chief Technical Officer, co-founder, and a director of MUL. Ortmann, as the director and sole shareholder of Netplus International Limited LLC, effectively owned 25% of the shares of MUL. From the onset of the Conspiracy through to January 20, 2012, Ortmann oversaw software programmers that developed the Mega Conspiracy's websites, and has handled technical issues with the ISPs. His particular areas of responsibility included setting up new servers, sending and responding to equipment service requests, and problem-solving connectivity problems with the Mega Conspiracy websites. Additionally, on numerous occasions, Ortmann received DMCA copyright infringement takedown notices from other conspirators and third-party companies. Ortmann also had authority to distribute funds from one of the Conspiracy's main financial accounts. Ortmann received a link to a copy of a copyrighted work associated with the Mega Conspiracy. In calendar year 2010 alone, Ortmann received more than $9 million from the Mega Conspiracy.

14. Andrus Nomm is a citizen of Estonia and a resident of both Turkey and Estonia. Nomm was a software programmer and Head of the Development Software Division for MUL. Nomm was responsible for the technical aspects of Megaclick.com. Nomm developed new projects, tested code, and provided routine maintenance for the site. Additionally, Nomm provided web coding assistance to various projects on other Mega Conspiracy websites. Such projects have included testing high definition video on Megavideo.com, installing the thumbnail screen captures for uploaded videos, and transferring still images across the various Mega Conspiracy website platforms. Nomm accessed at least one infringing copy of a copyrighted work from a computer associated with the Mega Conspiracy. In calendar year 2010, Nomm received more than $100,000 from the Mega Conspiracy.

15. Bram van der Kolk, who has also been known as "Bramos," is a resident of both the Netherlands and New Zealand. Van der Kolk is a Dutch citizen. Van der Kolk was the "Programmer-in-Charge" for MUL and MMG. Van der Kolk, as the director and sole shareholder of Mindpoint International Limited LLC, effectively owned 2.5% of the shares of MUL. From the onset of the Conspiracy through to January 20, 2012, Van der Kolk oversaw programming on the Mega Conspiracy websites, as well as the underlying network infrastructure. Van der Kolk was also responsible for responding to DMCA copyright infringement takedown notices sent to Mega Conspiracy sites. Van der Kolk also oversaw the selection of featured videos that were posted onto Megavideo.com, and he was, at times, in charge of the rewards program.
Van der Kolk personally uploaded multiple infringing copies of copyrighted works to Internet sites associated with the Mega Conspiracy and has searched servers controlled by the Mega Conspiracy for infringing copies of copyrighted works at the request of other co-conspirators, including several of the members of the Mega Conspiracy. In calendar year 2010, Van der Kolk received more than $2 million from the Mega Conspiracy.

## II.    Factual Background

16.    On or about January 5, 2012, the United States instituted criminal proceedings against the following individuals and entities when a federal grand jury sitting in Alexandria, Virginia, issued an indictment against them: Kim Dotcom, Megaupload Limited, Vestor Limited, Finn Batato, Julius Bencko, Sven Echternach, Mathias Ortmann, Andrus Nomm, and Bram van der Kolk (Criminal Case No. 1:12-cr-3). They were charged based on their involvement in the Mega Conspiracy, which was a worldwide criminal organization whose members engaged in criminal copyright infringement and money laundering on a massive scale with estimated harm to copyright holders well in excess of $500 million and reported income in

excess of $175 million. At or about the same time, the United States seized the Mega

Conspiracy's servers and domain names, and restrained its assets worldwide. On or about

February 16, 2012, the same individuals and entities were charged in a Superseding Indictment

with, in addition to the offenses charged in the original Indictment, committing wire fraud. The

Superseding Indictment is incorporated herein by reference.

17.    Megaupload.com was a commercial website and service operated by the Mega

Conspiracy that reproduced and distributed copies of popular copyrighted content over the

Internet without authorization. Between at least September 2005 and on or about January 20,

2012, Megaupload.com was used by the members of the Mega Conspiracy to willfully reproduce

and distribute many millions of infringing copies of copyrighted works, including motion

pictures, television programs, musical recordings, electronic books, images, video games, and

other computer software. As Ortmann noted on or about September 5, 2008, if there was "a

world ending nuclear war," Megaupload "could serve as a pretty complete archive of the world's

intellectual property for a coming generation."

18.    On its surface, the operation of Megaupload was relatively simple. Any Internet

user who visited the Megaupload.com website could upload a computer file. When a user

uploaded a file to Megaupload, the site reproduced the file on at least one computer server it

controlled and provided the uploading user with a unique Uniform Resource Locator ("URL")

link that allowed anyone with the link to download the file. For example, a link distributed on

December 3, 2006 by Dotcom (www.megaupload.com/?d=BY15XE3V) linked to a musical

recording by U.S. recording artist "50 Cent." Uploaders were incentivized to advertise the link

by publishing it on one or more of thousands of "referrer" or "linking" websites—symbiotic

websites that profited financially by helping users find pirated content on Megaupload, and sometimes other pirate websites.

19.     A single click on a Megaupload link accessed a Megaupload.com download page that allowed any Internet user to download a copy of the file from a computer server that was controlled by the Mega Conspiracy. Millions of internet users seeking to view or download pirated content would visit these "referrer" or "linking" websites, and would click on the links to download the infringing content.

**A.     The Mega Sites Were Purposefully Designed To Encourage Wide-Scale Copyright Infringement**

20.     The members of the Mega Conspiracy described themselves as "modern day pirates" and virtually every aspect of the Mega Sites was carefully designed to encourage and facilitate wide-scale copyright infringement. As an initial matter, users were encouraged to upload infringing content by Megaupload's "Uploader Rewards" program, pursuant to which uploaders were paid significant amounts depending upon the popularity of their uploads. Megaupload users who uploaded popular infringing content, such as pre-release or newly released movies, were paid thousands of dollars by the Mega Conspiracy. In total, the Mega Conspiracy directly paid uploaders millions of dollars through online payments. Some of the biggest repeat infringers were paid $50,000 or more by the Mega Conspiracy.

21.     Once a user uploaded a video file to Megavideo.com, software written by the Mega Conspiracy converted the video to a format known as Flash Video or "FLV," which allowed for quicker and broader distribution of files because Flash videos could be streamed through most internet browsers with a high level of compression at fast download speeds.

22.     The Mega Conspiracy also developed technology to allow users to stream "High Definition" ("HD") videos. On or about May 25, 2009, NOMM noted that "[e]ven though we

have lots of HD content uploaded most seems to be problematic quality or legality wise." The HD content was "problematic" legality wise because the vast majority of it was commercial motion pictures or television shows. On or about March 3, 2009, as the conspiracy was developing their HD technology, Ortmann pondered, in a Skype conversation with Van der Kolk, "what warner bros. will say when they see crystal clear BD rips [infringing copies of Blu-ray Discs] instead of the usual blurry video?" Van der Kolk responded, "yeah will be even more pissed off :)" and he later noted, "Hollywood will curse us :)".

23.     The Mega Conspiracy also developed software to identify the most popular files on the Mega Sites and reproduce them onto Mega's faster servers, which were those operated by Cogent Communications in Washington, D.C. An analysis of the 2,444 files on the Cogent servers showed that between 90 and 100% of the files stored on those servers were infringing. These faster servers thus facilitated the mass distribution of popular copyright-infringing works. The members of the Mega Conspiracy recognized the significance of the Cogent servers in Mega's architecture. On August 16, 2010, Ortmann wrote to Dotcom that, "if a US-court prohibits Cogent from providing us service, we will soon lose the vast majority of our connectivity worldwide."

24.     At times, the Mega Conspiracy also limited how long non-subscription users could watch videos, in an effort to convert these users to paid subscribers. As Ortmann explained to Dotcom on or about November 23, 2008, "[m]ovies last 90 minutes" but are "most interesting in the last 20 minutes" because "movies heighten the suspense towards the end." The Mega Conspiracy capitalized on this "sweet-spot," as Ortmann described it, by interrupting user's viewing experience approximately 72 minutes into the movie. If users wanted to continue watching the movie, they were required to obtain premium membership. This technique, of

course, could have only been effective if consumers were using the Mega Sites to view commercial length movies with the standard Hollywood "sweet-spot," that is infringing movies.

25.     Recognizing that their scheme was unlawful, members of the Mega Conspiracy discussed ways to restructure their infrastructure to make themselves "untouchable" by law enforcement. For example, on or about August 16, 2010, Dotcom told Ortmann via Skype, "at some point a judge will be convinced about how evil we are and then we're in trouble. We have to make ourselves invulnerable." To prevent this possibility, Dotcom suggested "a new hosting model" that would make Megaupload "independent from," its server hosting facilities, "Capathia or leaseweb." Dotcom said that Megaupload "should set up a fleet of our own servers with multiple hosters (15 or more in several countries) and make us untouchable." Dotcom reminded Ortmann, "you should not log our chats ;-) too much shit in there." Ortmann responded, "unfortunately Skype autologs them . . . I'm going to erase them all."

**B.      The Mega Conspiracy Purposefully Misled Copyright Holders**

26.     Throughout the conspiracy, members of the conspiracy regularly told copyright holders and their representatives that they would remove infringing content that the holders and their representatives had identified on Mega Conspiracy-controlled servers, when members of the Mega Conspiracy knew they would not. In particular, they deliberately misrepresented to copyright holders that they had removed copyright infringing content from their servers, while, in fact, they only removed Mega Conspiracy-created links to the content file (which could still be illegally downloaded through numerous redundant links). For instance, in response to takedown requests, Warner Brothers, one of the rightsholders, was repeatedly sent automated messages, falsely representing that a certain number of "file[s]" and "video[s]" were "removed" from the system (e.g., "6 files and 6 videos removed from our system"). In fact, only particular links to these infringing files and videos had been removed. Despite receiving many millions of requests

to remove infringing copies of copyrighted works, the conspirators, at best, only deleted the particular URL of which the copyright holder complained, and purposefully left the actual infringing copy of the copyrighted work on the Mega Conspiracy-controlled server, allowing access to the infringing work to continue.

27.    Furthermore, the members of the Mega Conspiracy either completely ignored, or purposefully delayed, their response to takedown requests from rightsholders that the conspirators believed were unlikely to pose a serious litigation risk. On April 23, 2009, Dotcom reminded the other conspirators not to respond to takedown notices from "insignificant sources" because complying with these takedown notices would result in a loss of "significant revenue" to the Mega Conspiracy. To Dotcom, "insignificant sources" apparently included sources originating from any country other than "the USA, France, Germany, UK and SPAIN." At other times, including on or about April 24, 2009, Dotcom's list of "significant sources" seemed to be limited only to "major organization[s] in the US."

28.    The members of the Mega Conspiracy also regularly told complaining rights holders and their representatives that the conspirators had deleted or blocked the user accounts of known and repeat copyright infringing users, when they had not. To the contrary, the conspirators knew many of the biggest repeat offenders by name, reviewed the content they uploaded before paying them, regularly praised their work, and then knowingly paid them thousands of dollars in exchange for their infringing uploads. For instance, the conspirators received 1,200 takedown requests based on URL links to the infringing content of one repeat infringer, identified here as TH. TH was important to the Mega Conspiracy because those links generated 1.2 million downloads of copyright infringing files hosted on the Mega Sites. Therefore, despite the 1,200 takedown notices, the conspirators paid TH 26 separate reward payments for a total of more than

$50,000, exempted TH from Megaupload's storage size limitations to accommodate his 30,000

files (almost 2.5 terabytes) and repeatedly discussed and praised TH in emails. For example, on

or about June 17, 2007, Ortmann told Van der Kolk that TH "is one of our most important

uploaders... I don't regret any of the dollars we send him every month."

29.     The members of the Mega Conspiracy also claimed to have a rigorous auditing

team to prevent distribution of infringing content. In fact, auditing guidelines Van der Kolk

emailed to an employee in 2007 made clear that, although auditors were to remove certain

content (e.g., pornography, "real killing," and "torture"), auditors were not to remove infringing

content. As Ortmann wrote Van der Kolk, "the important thing is that nobody must know that we

have auditors letting this stuff through" because DMCA protection "would go away."

### C.     The Mega Conspiracy Engaged In Extensive Efforts to Conceal Copyright Infringement

30.     The members of the Mega Conspiracy disguised the Mega Sites as "innocent"

electronic storage lockers, purportedly existing to allow users to store electronic files on the

cloud. As Ortmann told Van der Kolk on or about March 5, 2009, "now we're doing exactly what

I foresaw in the beginning—innocent front end, private back end :)". Van der Kolk clearly agreed

with this approach, telling Ortmann on or about October 10, 2009, "it's good to stay off the radar

by making the front end look like crap while all the piracy is going through direct links" from

referrer sites. In fact, when Ortmann described the Mega Conspiracy as "just a service provider"

on or about January 4, 2008, Van der Kolk responded, "yeah legally, but we know better :)".

In the same conversation, Van der Kolk made clear he was well aware that "we are the

pirates here."

31.     The members of the Mega Conspiracy went through great lengths to disguise the

true function of the Mega Sites. For example, despite the fact that the conspirators, themselves,

had the ability to, and did, search for particular files on Megaupload by file name, file type, file size, etc., they purposefully made it so the public could not search for content on sites. Instead of hosting a search function on its own site, the Mega Conspiracy business model purposefully relied on thousands of third party "linking" sites, which contained user-generated postings of links created by Megaupload.com (as well as those created by other Mega Sites, including Megavideo.com and Megaporn.com). This made it more difficult for rights owners to detect infringement, and gave the conspirators plausible deniability. As Ortmann wrote Van der Kolk on August 30, 2007, "searchability is dangerous and will kill us." Four years later, nothing had changed. On October 24, 2011, Batato pointed out that "mak[ing] the content searchable . . would basically mean that we can shut down Mega ;-)".

32.     Similarly, the Megaupload website prominently featured a "Top 100 files" list of the files that were purportedly the most frequently downloaded files on Megaupload. In 2008, Van der Kolk explained that the "Top 100" list was an effort to make the "whole site look much more legitimate & attractive as well." An accurate "Top 100 files" list, however, would include practically nothing but copyright infringing content. Thus, the conspirators carefully curated this list, to make sure it did not actually reflect any of the "Top 100 files," but instead reflected a rotating list of non-infringing "harmless stuff."

33.     Unlike the Megaupload site, the Megavideo site did purport to allow users to search for video files or to browse for video files by categories such as "Entertainment," "Comedy," "Music," or "Video Games." The members of the Mega Conspiracy, however, wrote software to automatically mark all videos longer than 10 minutes (*i.e.*, all commercial movies and television shows) as "private" to ensure that they would not be searchable or publically displayed on the front pages of Megavideo. These "private" videos could only be located through

the referrer sites. The exclusion of infringing content from the Megavideo's search engine,

however, meant that the conspirators had to find non-infringing content to display publically on

Megavideo. This was a significant challenge because, as Van der Kolk reminded Ortmann in

2009, "almost no harmless [i.e., non-infringing] stuff is being uploaded" to Megavideo.

34. To solve that problem, and to make Megavideo appear legitimate, the members of

the Mega Conspiracy developed software to secretly copy all of the videos on YouTube to

Megavideo, without the permission of YouTube or the owners of the videos. On or about October

4, 2007, Dotcom told Van der Kolk, "the day has 1440 minutes and I want to see one [YouTube]

Video upload [to Megavideo] every minute." On or about April 18, 2009, Van der Kolk

explained to Ortmann that "uploading new legit videos" from YouTube "continuously" would

"make the [Megavideo] site appear more legit." Van der Kolk added that "Megavideo has quite a

piracy image already."

35. In addition, the members of the Mega Conspiracy made the conscious decision to

conceal the user names of uploaders to frustrate rightsholders. On or about January 16, 2009,

Van der Kolk wrote Ortmann that "for copyright issues etc." the conspirators "should not

disclose [Megaupload] usernames anywhere." On March 13, 2009, Van der Kolk later elaborated

to Ortmann that disclosing user names would "not [be] good for repeat infringement offenders."

Similarly, the conspirators also decided not to disclose how many times each file had been

viewed or downloaded. As Ortmann explained to Van der Kolk on or about August 30, 2007, "as

we're displaying viewcounts, the copyright industry could be tempted to send us lost revenues

based on that." Van der Kolk responded, "that will hurt."

36. The members of the Mega Conspiracy also made a conscious effort, in the words

of Dotcom, to "stay below the radar." When a reporter from Forbes.com asked about

"Kim Schmitz" and "Tim Vestor's" (*i.e.*, Dotcom's) role in the company, Dotcom falsely wrote, "I can confirm that nobody by the name of Kim Schmitz is associated with our company." Dotcom further dissembled to the reporter, telling him that "[w]e have a policy not to disclose details about our business performance. But I can tell you (off the record) that we are a small and humble business trying to earn enough to pay the bandwidth bill. Our site has grown to be popular but it is not easy to monetize the traffic in this economy." Continuing the deceit, Dotcom added that "[t]he vast majority of users is uploading home videos, web cam captures, content they own or have the right to copy and other legitimate content."

### D.   The Mega Conspiracy Stashed Away Millions of Dollars In Criminal Proceeds

37.   The Mega Conspiracy obtained the vast majority of their criminal proceeds by selling "premium subscriptions." Premium subscriptions for Megaupload.com were, at times, available for online purchase for as little as a few dollars per day, or as much as approximately $260 for a lifetime. Subscription fees collected during the existence of the Mega Conspiracy from premium users totaled more than $150 million.

38.   Users would pay for premium subscriptions so that they could: (a) get paid for uploading and advertising popular (*i.e.*, infringing) content pursuant to Megaupload's "uploaders rewards" program; (b) decrease wait and download times, which could be at least an hour for popular content (and, at times, unpaid users were ineligible to download files over a certain size); (c) upload and download files with few, if any, limitations; and (d) watch movie-length infringing videos without interruptions.

39.   While it was theoretically possible for "legit [i.e., non-infringing] users" to purchase premium subscriptions, there was little reason for such users, if they existed, to do so. Van der Kolk told Ortmann on March 8, 2009 that "legit users" were not a source of revenue to

the Mega Conspiracy, stating "that's not what we make $ with :)". Consistently, on October 7, 2007, Van der Kolk told Ortmann that if the Mega Conspiracy automatically deleted videos that were likely to contain infringing content (*i.e.*, videos that were longer than 30 minutes and had a significant number views) they would end up deleting "99.999%" of all the content on Megavideo. Similarly, on January 25, 2008, Van der Kolk told Ortmann that "more than 90%" of the Mega Conspiracy's "profit" was specifically derived from "infringing files." On November 21, 2009, Ortmann told Van der Kolk that Megavideo's public [*i.e.*, non-infringing] videos "could not possibly have generated any significant payments." Thus, the members of the Mega Conspiracy were fully aware that users purchased "premium subscriptions" to engage in copyright infringement.

40.     To purchase "premium subscriptions," users primarily made payments through PayPal.com, a U.S.-based global e-commerce business allowing payments and money transfers over the Internet. The Mega Conspiracy's PayPal, Inc. account was utilized to receive payments from the Eastern District of Virginia and elsewhere for premium Megaupload.com subscriptions. The same PayPal, Inc. account was used by the Conspiracy to pay Carpathia Hosting in the Eastern District of Virginia and Leaseweb in the Netherlands as well as other operating expenses (including, but not limited to, direct financial rewards to uploaders of popular content in the Eastern District of Virginia and elsewhere).

41.     In order to do business through PayPal, the members of the Mega Conspiracy repeatedly deceived their payment processor. Between just 2010 and 2011, PayPal sent Megaupload more than 145 takedown notices referencing more than 3,400 infringing links. The copyrighted materials associated with these links had been downloaded more than 799,000 times. Ortmann repeatedly responded directly to PayPal, assuring PayPal that the infringing files had

been removed or deleted, and 220 of the approximately 330 registered users who uploaded the files had been blocked from using the Mega Sites. For example, on or about September 17, 2011, Ortmann wrote PayPal that "[a]ll infringing uploads have been deleted and their uploader blocked." In fact, none of the infringing files were ever deleted, and as of January 19, 2012, only approximately 18 of the 220 registered users had been blocked from using the Mega Sites for any reason.

42.     The members of the Mega Conspiracy were aware that no legitimate payment processor would have worked with the Mega Conspiracy if it were aware that the Mega Conspiracy was basically ignoring their takedown requests. In fact, in 2011, Dotcom emailed PayPal to advise them "not to work with sites that are known to pay uploaders for pirated content" because these sites "pay everyone (no matter if the files are pirated or not) and have NO repeat infringer policy." Until August 2011, however, the Mega Sites routinely paid repeat infringers for uploading pirated content.

## III.    THE DEFENDANT BANK ACCOUNTS AND PROPERTY

43.     DBS BANK (HONG KONG) LIMITED ACCOUNT NUMBER 7881380320 held in the name of Megaupload Limited (the "DBS 0320 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to a Mutual Legal Assistance Treaty (MLAT) request by the United States Government, froze the assets on deposit in the DBS 0320 account. As of that date, the balance in that account was HKD 36,880,460.

44.     The DBS 0320 account received and was used to launder the proceeds of the violations detailed in the Superseding Indictment and elsewhere in this complaint. The DBS 0320 account was a funnel account that received all of the proceeds of the copyright infringements and then transferred those proceeds to various accounts in Hong Kong, New

Zealand, and elsewhere. The account was equipped to manage transactions in five different currencies (Hong Kong Dollars, U.S. Dollars, Euros, British Pound, and Japanese Yen).

45.     Records indicate that from August 2007 through January 2012 there were 1,403 deposits into the DBS 0320 account totaling HKD 1,260,508,432.01 from a PayPal account (the "PayPal account"). These funds represent proceeds of crime and property involved in money laundering as more fully set out herein.

46.     Megaupload also used Moneybookers[1] to accept payment from various individuals for access to the Megaupload website. Records indicate that Moneybookers transferred USD 280,000 and EUR 3,980,311 to the DBS 0320 account.

47.     CITIBANK ACCOUNT NUMBER 59378921 held in the name of Kim Tim Jim Vestor (the "Citi 8921 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the Citi 8921 account. As of that date, the balance in that account was HKD 1,408,338.

48.     Records indicate that from October 24, 2008 through September 22, 2011, there were 38 wire transfers into the Citi 8921 account from the DBS 0320 account totaling HKD 276,650,000.

49.     CITIBANK ACCOUNT NUMBER 59378948 held in the name of Kim Tim Jim Vestor (the "Citi 8948 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the Citi 8948 account. As of that date, the balance in that account was HKD 52,189.

50.     Records indicate that from July 16, 2009 through November 16, 2009, there were three wire transfers into the Citi 8948 account from the DBS 0320 account totaling

---

[1] Moneybookers is very similar to PayPal and allows entities and individuals to transfer money, much in the same way that PayPal operates.

HKD 19,397,500. Records also indicate that the Citi 8948 account also received one wire transfer for EUR 108,069.16 from the DBS 0320 account on May 22, 2009. In addition, between April 29, 2009 and June 3, 2009, the Citi 8948 account received 5 wire transfers totaling USD 449,000 from the DBS 0320 account.

51.     CITIBANK ACCOUNT NUMBER 23749938 held in the name of Kim Tim Jim Vestor (the "Citi 9938 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the Citi 9938 account. As of that date, the balance in that account was HKD 135,464,800.

52.     Records indicate that the Citi 9938 account was opened in or about May 2008. In addition, records indicate that from the opening of the account through on or about January 20, 2012, when the account was frozen, every transfer into the Citi 9938 account came from either the Citi 8921 or the Citi 8948 account.

53.     DBS BANK (HONG KONG) LIMITED ACCOUNT NUMBER 7881226160 held in the name of Vestor Limited (the "DBS 6160 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the DBS 6160 account. As of that date, the balance in that account was HKD 520,185.

54.     Records indicate that on February 1, 2010 there was a wire transfer from the DBS 0320 account for HKD 1,000,000 and on February 8, 2011, there was another wire transfer from the DBS 0320 account for HKD 17,000,000. In addition, on February 1, 2010, the DBS 6160 account received a wire transfer for USD 100,000 from the DBS 0320 account.

55.     HSBC BANK ACCOUNT NUMBER 083643379833 held in the name of Julius Bencko (the "HSBC 9833 account"): On or about January 20, 2012, Hong Kong authorities,

pursuant to an MLAT request by the United States Government, froze the assets on deposit in the HSBC 9833 account. As of that date, the balance in that account was HKD 4,824,622.

56.     Records indicate that on January 21, 2010 there was a wire transfer from the DBS 0320 account for HKD 3,750,100 and on March 17 2011, there was another wire transfer from the DBS 0320 account for HKD 7,942,690. In addition, between November 2, 2009 and May 4, 2011, the HSBC 9833 account received 10 wire transfers totaling EUR 58,890 from the DBS 0320 account.

57.     DBS VICKERS BANK ACCOUNT NUMBER 3520894 held in the name of Megamedia Limited (the "DBS 0894 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the DBS 0894 account. As of that date, the balance in that account was HKD 6,053,970.

58.     Records indicate that on July 10, 2009 there was a wire transfer from the DBS 0320 account for HKD 1,600,000 and on September 24 2009, there was another wire transfer from the DBS 0320 account for HKD 2,700,000. In addition, on June 17, 2009 and January 17, 2011, the DBS 0894 account received 2 wire transfers totaling EUR 575,153.34 from the DBS 0320 account, and one more wire transfer on September 17, 2009 for USD 1,050,000 from the DBS 0320 account.

59.     HSBC BANK ACCOUNT NUMBER 491538187833 held in the name of Sven Echternach (the "HSBC 7833 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the HSBC 7833 account. As of that date, the balance in that account was HKD 6,510,966.

60.     Records indicate that between June 5, 2008 and July 5, 2011, there were three wire transfers into the HSBC 7833 account from the DBS 0320 account totaling HKD 4,921,777.21.

61.     DBS BANK (HONG KONG) LIMITED ACCOUNT NUMBER 7883024440 held in the name of Megapay Limited (the "DBS 4440 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the DBS 4440 account. As of that date, the balance in that account was HKD 7,159,307.

62.     Records indicate that on April 22, 2010 there was a wire transfer from the DBS 0320 account for HKD 1,500,000. In addition, between July 30, 2010 and April 19, 2011, there were four wire transfers into the DBS 4440 account totaling USD 700,000 from the DBS 0320 account.

63.     HSBC BANK ACCOUNT NUMBER 083643403833 held in the name of Bram Van Der Kolk (the "HSBC 3833 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the HSBC 3833 account. As of that date, the balance in that account was HKD 16,096,412.

64.     Records indicate that between November 2, 2009 and March 17, 2011, there were three wire transfers from the DBS 0320 account into the HSBC 3833 account totaling HKD 23,511,383. In addition, on April 27, 2009 and December 20, 2012, the HSBC 3833 account received 2 wire transfers totaling EUR 105,010 from the DBS 0320 account.

65.     HSBC BANK ACCOUNT NUMBER 503584435833 held in the name of Finn Batato (the "HSBC 5833 account"): On or about January 20, 2012, Hong Kong authorities,

pursuant to an MLAT request by the United States Government, froze the assets on deposit in the HSBC 5833 account. As of that date, the balance in that account was HKD 2,291,348.

66.     Records indicate that between on June 3, 2008, there was a wire transfer from the DBS 0320 account into the HSBC 5833 account for HKD 150,000. In addition, on December 1 and 20, 2010, the HSBC 5833 account received 2 wire transfers totaling EUR 23,605.42 from the DBS 0320 account.

67.     HSBC BANK ACCOUNT NUMBER 813010204833 held in the name of Mathias Ortmann (the "HSBC 4833 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the HSBC 4833 account. As of that date, the balance in that account was HKD 101,680,294.

68.     Records indicate that between February 10, 2009 and April 4, 2011 there were 18 wire transfers from the DBS 0320 account into the HSBC 4833 account totaling HKD 109,064,765.

69.     INDUSTRIAL AND COMMERCE BANK OF CHINA (ICBC) ACCOUNT NUMBER 954520008434 held in the name of Mathias Ortmann (the "ICBC 8434 account"): On or about January 20, 2012, Hong Kong authorities, pursuant to an MLAT request by the United States Government, froze the assets on deposit in the ICBC 8434 account. As of that date, the balance in that account was HKD 11,202,268.

70.     These funds represent proceeds of crime and property involved in money laundering as more fully set out herein. Records indicate that on or about March 17, 2011 and July 5, 2011, there were transfers into the ICBC 8434 account from the DBS 0320 account of HKD 1,200,000 and HKD 10,000,000, respectively.

71.    COMPUTERSHARE INVESTOR SERVICES LIMITED HOLDER

NUMBER 14824385 held in the name of Kim Dotcom (the "Computershare account"): On or

about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United

States Government, froze the assets on deposit in the Computershare account. As of that date, the

Computershare account held New Zealand government bonds with a face value of

NZD 10 million, which generate 6% interest annually and mature on or about April 15, 2015.

72.    These funds represent proceeds of crime and property involved in money

laundering as more fully set out herein. Records indicate that on or about November 10, 2010,

HKD 70 million was transferred from the Citi 8921 account (which received proceeds from the

DBS 0320 account, which received proceeds from the PayPal account) to ANZ Bank account

number ending in 1200 held in the name of Kim Dotcom care of Simpson Grierson (the

"ANZ 1200 account"). On or about November 15, 2010, NZD 10,639,321.02 was transferred

from the ANZ 1200 account to the Computershare account for the purchase of the

government bonds.

73.    HONGKONG AND SHANGHAI BANKING CORPORATION ACCOUNT

NUMBER 3029340126642088 held in the name of Bram van der Kolk (the "HSBC 2088

account"): On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request

by the United States Government, froze the assets on deposit in the HSBC 2088 account. As of

that date, the balance in that account was NZD 533,349.55.

74.    These funds represent proceeds of crime and property involved in money

laundering as more fully set out herein. Records indicate that from on or about April 26, 2011

through May 23, 2011, there were 4 wire transfers into the HSBC 2088 account from the

HSBC 3833 account (which received proceeds from the DBS 0320 account, which received proceeds from the PayPal account) totaling NZD 407,500.

75.     ANZ BANK ACCOUNT NUMBER 011839015545900 held in the name of Megastuff Limited (the "ANZ 5900 account"): These funds represent proceeds of crime and property involved in money laundering as more fully set out herein. Records indicate that from on or about May 13, 2010 through March 17, 2011, there were 17 wire transfers into the ANZ 5900 account from the DBS 0320 account (which received proceeds from the PayPal account) totaling HKD 70,825,100. In addition, on or about May 28, 2010, there was 1 wire transfer into the ANZ 5900 account from the DBS 6160 account (which received proceeds from the DBS 0320 account, which received proceeds from the PayPal account) in the amount of HKD 5,315,000. The following properties were purchased with proceeds from the ANZ 5900 account:

       a.    2009 CALCITE WHITE MERCEDES BENZ E500 COUPE, VIN WDD2073722F019582, AND INCLUDING LICENSE PLATE "FEG690": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about May 28, 2010, approximately NZD 130,000 was transferred from the ANZ 5900 account to purchase the vehicle, and New Zealand motor vehicle records indicate that it was registered to Megastuff Limited at the time it was restrained.

       b.    2005 SILVER MERCEDES BENZ CLK DTM, VIN WDB2093422F165517, AND INCLUDING LICENSE PLATE "GOOD": On or about February 1, 2012, New Zealand

authorities, pursuant to an MLAT request by the United States

Government, restrained this vehicle. Records indicate that on or about

May 28, 2010, approximately NZD 400,000 was transferred from the

ANZ 5900 account to purchase the vehicle, and New Zealand motor

vehicle records indicate it was registered to Wayne Tempero at the time it

was restrained.

c.   TWO 2010 BLACK MINI COOPER S COUPES,

VIN WMWZG3200TZ03651 AND WMWZG3200TZ03648,

AND INCLUDING LICENSE PLATES "T" and "V": On or about

February 1, 2012, New Zealand authorities, pursuant to an MLAT request

by the United States Government, restrained these two vehicles. Records

indicate that on or about November 12, 2010, approximately NZD 45,218

was transferred from the ANZ 5900 account to purchase these vehicles,

and New Zealand motor vehicle records indicate that they were registered

to Megastuff Limited at the time they were restrained. The "Write Up

Sheet" purchase document for these vehicles shows that the total purchase

price for these vehicles was NZD 130,420 (NZD 65,210 each), partially

paid through the transfer of NZD 45,218 and completed through a trade-in

of two other Mini Coopers (valued at NZD 76,000). On or about

November 23, 2012, with consent from the owner, these vehicles were

sold at auction for NZD 66,000 (NZD 33,000 each), and the proceeds

were deposited into the Official Assignee's trust account.

d. 2010 MERCEDES BENZ ML63 AMG, VIN WDC1641772A542449,

AND INCLUDING LICENSE PLATE "GUILTY": On or about February

1, 2012, New Zealand authorities, pursuant to an MLAT request by the

United States Government, restrained this vehicle. Records indicate that

on or about January 6, 2011, approximately NZD 160,000 was transferred

from the ANZ 5900 account to purchase the vehicle, and New Zealand

motor vehicle records indicate that it was registered to Wayne Tempero at

the time it was restrained. On or about November 23, 2012, with consent

from the owner, this vehicle was sold at auction for NZD 83,000, and the

proceeds were deposited into the Official Assignee's trust account.

e. 2011 BLACK TOYOTA HILUX, VIN MROFZ29G001599926,

AND INCLUDING LICENSE PLATE "FSN455": On or about February

1, 2012, New Zealand authorities, pursuant to an MLAT request by the

United States Government, restrained this vehicle. Records indicate that

on or about January 24, 2011, approximately NZD 62,555 was transferred

from the ANZ 5900 account to purchase the vehicle, and New Zealand

motor vehicle records indicate that it was registered to Neil Stratful at the

time it was restrained.

f. 2010 BLACK MERCEDES BENZ CL63 AMG,

VIN WDD2163742A026653, AND INCLUDING LICENSE PLATE

"HACKER": On or about February 1, 2012, New Zealand authorities,

pursuant to an MLAT request by the United States Government, restrained

this vehicle. Records indicate that on or about February 9, 2011,

approximately NZD 320,000 was transferred from the ANZ 5900 account to purchase the vehicle, and New Zealand motor vehicle records indicate that it was registered to Wayne Tempero at the time it was restrained.

g. VICTOR CONTI DUTCH ANGEL-BIKE, NZ ID# 546420: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this motor cycle. Records indicate that on or about July 19, 2010, approximately NZD 68,679.35 was transferred from the ANZ 5900 account to purchase the motor cycle.

h. 2004 SILVER MERCEDES BENZ CLK DTM CABRIOLET, VIN WDB2094421T067269: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about November 3, 2010, approximately NZD 31,652 was transferred from the ANZ 5900 account toward the purchase the vehicle, and on or about November 12, 2010, an additional NZD 281,132.86 was transferred from the ANZ 5900 account to complete the purchase of this vehicle.

i. FOUR 2010 SEA-DOO GTX JET SKIS, VINS YDV03103E010, YDV00375L910, YDV00385L910, & YDV03091E010: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained these jet skis. Records indicate that on or about November, 19, 2010, approximately NZD 82,229.65 was transferred from the ANZ 5900 account to purchase the jet skis.

76.     WESTPAC BANKING ACCOUNT NUMBER 0301040943847002 held in the name of Simpson Grierson Trust Account, holder Kim Dotcom (the "Westpac account)". These funds represent proceeds of crime and property involved in money laundering as more fully set out herein. Records indicate that from on or about January 1, 2010 through December 31, 2010, there were multiple wire transfers into the Westpac account from the DBS 0320 (which received proceeds from the PayPal account) account totaling NZD 1.2 million. In addition, on or about February 17, 2010 and December 16, 2011, there were wire transfers into the Westpac account from the DBS 6160 account (which received proceeds from the DBS 0320 account, which received proceeds from the PayPal account) in the amounts of HKD 6,866,250 and HKD 22,870,224, respectively. The following real properties were purchased with proceeds from the Westpac account:

      a.     THE PROPERTY AT 5G THE PROM, COATESVILLE, AUCKLAND 0793, NEW ZEALAND, BEING ALL THAT PARCEL OF LAND ON CERTIFICATE OF TITLE NUMBER 341889: Or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this property. It was purchased on or about November 19, 2011, together with 5H The Prom, by Kim Dotcom for a total of NZD 4,330,000. New Zealand real estate records indicate the property is still currently owned by Kim Dotcom. Funds from the Westpac account, which were among those used to launder the proceeds of the crimes set forth above, were used to pay for the purchase, mortgage, maintenance, and other costs associated with the property. Records show that on or about September 2, 2011,

approximately NZD 433,000 was transferred from the ANZ 5900 account to the Westpac account, and the notation indicated that the transfer was for "Deposit Property 5H The Prom". In addition, the notation for the December 16, 2011 wire transfer into the Westpac account from the DBS 6160 account in the amount of HKD 22,870,224 indicated that the transfer was for "Payment for the 5H Prom".

b. THE PROPERTY AT 5H THE PROM, COATESVILLE, AUCKLAND 0793, NEW ZEALAND, BEING ALL THAT PARCEL OF LAND ON CERTIFICATE OF TITLE NUMBER 341890 ON DEPOSIT PLAN 385357: Or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this property. It was purchased on or about November 19, 2011, together with 5G The Prom, by Kim Dotcom for a total of NZD 4,330,000. New Zealand real estate records indicate the property is still currently owned by Kim Dotcom. Funds from the Westpac account, which were among those used to launder the proceeds of the crimes set forth above, were used to pay for the purchase, mortgage, maintenance, and other costs associated with the property. Records show that on or about September 2, 2011, approximately NZD 433,000 was transferred from the ANZ 5900 account to the Westpac account, and the notation indicated that the transfer was for "Deposit Property 5H The Prom". In addition, the notation for the December 16, 2011 wire transfer into the Westpac account from the DBS

6160 account in the amount of HKD 22,870,224 indicated that the transfer was for "Payment for the 5H Prom".

77.     ASB BANK ACCOUNT NUMBER 123107006652100 held in the name of Kim Tim Jim Vestor (the "ASB 2100 account"): These funds represent proceeds of crime and property involved in money laundering as more fully set out herein. Records indicate that from on or about February 8, 2010 through May 3, 2010, there were 7 wire transfers into the ASB 2100 account from the DBS 0320 account (which received proceeds from the PayPal account) totaling HKD 15,041,700. The following properties were purchased with proceeds from the ASB 2100 account:

a.      2008 BLACK ROLLS ROYCE PHANTOM COUPE, VIN SCA2D68098UH07049, AND INCLUDING LICENSE PLATE "GOD": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about March 30, 2010, approximately NZD 535,000 was transferred from the ASB 2100 account to purchase the vehicle, and New Zealand motor vehicle records indicate that it was registered to Wayne Tempero at the time it was restrained.

b.      2004 SILVER MERCEDES BENZ CLK DTM AMG 5.5L KOMPRESSOR, VIN WDB2093422F166073, AND INCLUDING LICENSE PLATE "EVIL": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about April 16, 2010, approximately NZD 310,000 was transferred from the

ASB 2100 account to purchase the vehicle, and New Zealand motor vehicle records indicate that it was registered to Wayne Tempero at the time it was restrained.

c.  2010 BLACK MERCEDES BENZ E63 AMG, VIN WDD2120772A103834, AND INCLUDING LICENSE PLATE "STONED": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about February 26, 2010, approximately NZD 231,000 was transferred from the ASB 2100 account to purchase the vehicle, and New Zealand motor vehicle records indicate that it was registered to Megastuff Limited at the time it was restrained. On or about November 23, 2012, with consent from the owner, this vehicle was sold at auction for NZD 93,500, and the proceeds were deposited into the Official Assignee's trust account.

d.  2009 BLACK MERCEDES BENZ ML63 AMG, VIN WDC1641772A486965, AND INCLUDING LICENSE PLATE "MAFIA": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about March 11, 2010, approximately NZD 155,000 was transferred from the ASB 2100 account to purchase the vehicle, and New Zealand motor vehicle records indicate that it was registered to Wayne Tempero at the time it was restrained.

e.  1957 BLACK CADILLAC EL DORADO, VIN 5770137596: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about March 5, 2010, approximately NZD 144,400 was transferred from the ASB 2100 account to Number One Limited for the purpose of purchasing the vehicle. In addition, on or about March 5, 2010, approximately USD 100,000 was transferred from Number One Limited to purchase the vehicle.

f.  1959 PINK CADILLAC SERIES 62 CONVERTIBLE, VIN 59F115669: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about May 4, 2010, approximately NZD 150,000 was transferred from the ASB 2100 account to International Motor Sports for the purpose of purchasing the vehicle. In addition, on or about May 14, 2010, approximately USD 100,000 was transferred from International Motor Sports to purchase the vehicle.

g.  2010 BLACK MERCEDES BENZ S65 AMG, VIN WDD2211792A324354, AND INCLUDING LICENSE PLATE "CEO": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about November 2, 2009, approximately NZD 323,000 was transferred from the DBS 0320 account (which received proceeds from the PayPal account) toward the purchase of

the vehicle, and on or about March 18, 2010, approximately NZD 323,000 was transferred from the ASB 2100 account to complete the purchase of the vehicle. New Zealand motor vehicle records indicate that it was registered to Andrew Bowden at the time it was restrained.

h.  2010 BLACK MERCEDES BENZ CL65 AMG, VIN WDD2163792A025130, AND INCLUDING LICENSE PLATE "KIMCOM": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that on or about November 2, 2009, approximately NZD 323,000 was transferred from the DBS 0320 account (which received proceeds from the PayPal account) toward the purchase of the vehicle, and on or about March 18, 2010, approximately NZD 323,000 was transferred from the ASB 2100 account to complete the purchase of the vehicle. New Zealand motor vehicle records indicate that it was registered to Wayne Tempero at the time it was restrained.

78.  BANK OF NEW ZEALAND BANK ACCOUNT NUMBER 020192009920004 held in the name of Cleaver Richards Limited Trust Account for Megastuff Limited (the "BNZ 0004 account"): These funds represent proceeds of crime and property involved in money laundering as more fully set out herein. Records indicate that from on or about May 11, 2011 through July 21, 2011, there were 6 wire transfers into the BNZ 0004 account from the DBS 0320 account (which received proceeds from the PayPal account) totaling HKD 8,632,850. The following properties were purchased with proceeds from the BNZ 2004 account:

a.   2011 BLACK MERCEDES BENZ G55 AMG,

VIN WDB4632702X193395, AND INCLUDING LICENSE PLATE

"POLICE": On or about February 1, 2012, New Zealand authorities,

pursuant to an MLAT request by the United States Government, restrained

this vehicle. Records indicate that on or about·December 8, 2011,

approximately NZD 149,200 was transferred from the BNZ 0004 account

toward the purchase of the vehicle, and the notation indicated that the

transfer was for "DOTCOMG55". In addition, records indicate that the

cost of the vehicle was offset through a trade-in of a 2009 Mercedes

Benz ML63 AMG with license plate "WANTED". New Zealand motor

vehicle records indicate that it was registered to Wayne Tempero at the

time it was restrained.

79.   2010 BLACK TOYOTA VELLFIRE V6, VIN 7AT0H65MX11041670,

AND INCLUDING LICENSE PLATE "WOW": On or about February 1, 2012, New Zealand

authorities, pursuant to an MLAT request by the United States Government, restrained this

vehicle. Records indicate that the vehicle was purchased on or about December 14, 2010, during

the course of the conspiracy, and the registered owner, Megastuff Limited, had no other

legitimate income during that time period to purchase the vehicle. New Zealand motor vehicle

records indicate that it was registered to Megastuff Limited at the time it was restrained.

80.   2011 MERCEDES BENZ G55 AMG, VIN WDB4632702X191902,

AND INCLUDING LICENSE PLATE "GDS672": On or about February 1, 2012, New Zealand

authorities, pursuant to an MLAT request by the United States Government, restrained this

vehicle. Records indicate that on or about August 12, 2011, approximately NZD 30,000 was

transferred from the BNZ 0004 account toward the purchase of the vehicle. In addition, records indicate that on or about October 25, 2011, approximately NZD 219,980 was transferred from the DBS 0320 account to a Kiwibank account number ending in 2700 held in the name of Kim Dotcom for a cashier's check, dated on or about October 27, 2011, in the amount of NZD 202,000 to purchase the vehicle. New Zealand motor vehicle records indicate that it was registered to Wayne Tempero at the time it was restrained.

81.     2005 SILVER MERCEDES BENZ A170, VIN WDD1690322J184595, AND INCLUDING LICENSE PLATE "FUR252": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that the vehicle was purchased on or about May 2, 2011, during the course of the conspiracy, and the registered owner, Bram van der Kolk, had no other legitimate income during that time period to purchase the vehicle. New Zealand motor vehicle records indicate that it was registered to Bram van der Kolk at the time it was restrained.

82.     2005 SILVER MERCEDES BENZ ML500, VIN WDC1641752A026107, AND INCLUDING LICENSE PLATE "DFF816": On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this vehicle. Records indicate that the vehicle was purchased on or about May 16, 2011, during the course of the conspiracy, and the registered owner, Bram van der Kolk, had no other legitimate income during that time period to purchase the vehicle. New Zealand motor vehicle records indicate that it was registered to Bram van der Kolk at the time it was restrained.

83.     SHARP 108" LCD DISPLAY TV: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this television. Records indicate that on or about November 30, 2009, approximately

HKD 2.3 million was transferred from the DBS 0320 account to purchase "TWO 108 INCH SHARP LCD SCREENS."

84.   THREE SAMSUNG 820DXN 82" LCD TVs: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained these 3 televisions. Records indicate that on or about November 18, 2010, approximately HKD 1,238,000 was transferred from the DBS 0320 account to purchase these 3 televisions.

85.   DEVON WORKS LLC, TREAD #1 TIME PIECE: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this time piece. Records indicate that on or about December 1, 2010, approximately USD 10,000 was transferred from the DBS 0320 account toward the purchase of the time piece.

86.   IN HIGH SPIRITS BY OLAF MUELLER PHOTOGRAPHS FROM THE CAT STREET GALLERY: On or about February 1, 2012, New Zealand authorities, pursuant to an MLAT request by the United States Government, restrained this artwork. Records indicate that on or about March 3, 2010, approximately HKD 1,060,000 was transferred from the DBS 0320 account to purchase the artwork.

## FIRST CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 2323(a)(1)(C))

87.   The United States incorporates by reference paragraphs 1 through 86 above as if fully set forth herein.

88.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) or a conspiracy to commit such an offense."

89.     Title 18, United States Code, Section 1956(c)(7)(D) provides that the term "specified unlawful activity" includes "an offense under . . . section 2319 (relating to copyright infringement)."

90.     Title 18, United States Code, Section 2319 sets forth the penalties for willful infringement of a copyright in violation of 17 U.S.C. § 506(a).

91.     Title 17, United States Code, Section 506(a) prohibits a person from willfully infringing a copyright (1) for commercial advantage or private financial gain; (2) by reproducing or distributing, including by electronic means, infringing copies of works with a total retail value of over $1,000 over a 180-day period; or (3) by distributing a "work being prepared for commercial distribution" by making it available on a publicly accessible computer network, if the person knew or should have known that the work was intended for commercial distribution.

92.     Title 18, United States Code, Section 2323(a)(1)(B) and (C) likewise subjects to forfeiture "[a]ny property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of an offense" under 17 U.S.C. § 506 or 18 U.S.C. § 2319, as well as "[a]ny property used, or intended to be used, in any manner or part to commit or facilitate the commission of" such an offense.

93.     As set forth above and as incorporated in the Superseding Indictment, the Mega Conspiracy wilfully infringed and conspired to wilfully infringe copyrighted works when, for purposes of commercial advantage and private financial gain, it took numerous copyrighted works, including works it knew were being prepared for commercial distribution, and made them available on a publicly accessible computer network.

94.     As set forth above, the Defendant Properties constitute criminal proceeds that the Mega Conspiracy generated through its criminally infringing acts in violation of 17 U.S.C. § 506 and 18 U.S.C. § 2319, and/or property used or intended to be used to facilitate those offenses.

95.     As such, the Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 2323(a)(1)(B) and (C).

## SECOND CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. § 981(a)(1)(A))

96.     The United States incorporates by reference paragraphs 1 through 95 above as if fully set forth herein.

97.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 [or] 1957 . . . of this title, or any property traceable to such property."

98.     Title 18, United States Code, Section 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)    (i) with the intent to promote the carrying on of specified unlawful activity; or
>
> ***
>
> (B)    knowing that the transaction is designed in whole or in part—
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

99.     Title 18, United States Code, Section 1956(a)(2) further imposes a criminal penalty on any person who:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

(A)   with the intent to promote the carrying on of specified unlawful activity; or

(B)   knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—

(i)   to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

100.   Title 18, United States Code, Section 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." A "monetary transaction" includes the "deposit, withdrawal, transfer or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1).

101.   Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who conspires to commit any offense defined in 18 U.S.C. §§ 1956 or 1957.

102.   As noted above, "specified unlawful activity" includes criminal copyright infringement.

103.   As set forth above, the Defendant Properties constitute property involved in money laundering transactions and attempted money laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957, and are therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered in its favor against the

Defendant Properties; that pursuant to law, notice be provided to all interested parties to appear

and show cause why the forfeiture should not be decreed; that the Defendant Properties be

forfeited to the United States of America and delivered into its custody for disposition according

to law; that Plaintiff be awarded its costs and disbursements in this action; and for such and

further relief as this Court may deem just and proper.


Respectfully submitted,

Dana J. Boente
United States Attorney

By:

Karen Ledbetter Taylor
Assistant United States Attorney
Attorney for the United States of America
United States Attorney's Building
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
Fax: 703-299-3982
Email Address: Karen.taylor2@usdoj.gov

## VERIFICATION

Before me, the undersigned authority, on this date personally appeared FBI Special Agent

Rodney Hays, who after being duly sworn, states that he makes this verification for and on

behalf of the Plaintiff, United States of America, that he has read the foregoing complaint and

knows the contents thereof, that his information and knowledge about its contents was obtained

by him in the course of his investigation and that of other law enforcement officers and

government agents, and that the matter and things set forth in the complaint are true to the best of

his knowledge, information and belief.

_____

Rodney Hays
Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me
this 29th day of July 2014

Melvin Larry Victor
Notary Public


My commission expires:   Sept. 30, 2017
Alexandria, Virginia


```
MELVIN LARRY VICTOR
NOTARY PUBLIC
REGISTRATION # 246797
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
SEPTEMBER 30, 2017
```