IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALL ASSETS LISTED IN ATTACHMENT
A, AND ALL INTEREST, BENEFITS, AND
ASSETS TRACEABLE THERETO,

Defendants *in Rem.*

Civil Action No.: 1:14-cv-969

The Honorable Liam O'Grady

## UNITED STATES' MOTION TO STRIKE
## CLAIM OF MONA DOTCOM

The United States, by and through the undersigned attorneys, moves this Court to strike

the claim of Mona Dotcom under Supplemental Rule G(8)(c)(i)(B), of the Federal Rules of Civil

Procedure based on her lack of standing.

### PROCEDURAL HISTORY

On July 29, 2014, the United States commenced this action by filing a Verified

Complaint for Forfeiture *In Rem* (Dkt. 1) for assets arising from the Mega Conspiracy's criminal

copyright infringement and money laundering scheme. All of the fugitive Claimants, two

fugitive-controlled corporations, and a non-claimant were indicted in this district on January 5,

2012, for racketeering conspiracy (18 U.S.C. § 1962(d)), copyright infringement (18 U.S.C. §

2319 and 17 U.S.C. § 506) and money laundering conspiracy (18 U.S.C. § 1956(h)); arrest

warrants were issued against all of the individual defendants. A superseding indictment that

added wire fraud charges (under 18 U.S.C. § 1343) was returned against the same defendants on

February 16, 2012.

Four out of the six fugitive Claimants (Kim Dotcom, Matthias Ortmann, Finn Batato, and

Bram van der Kolk) were arrested in New Zealand on the original indictment on January 19 or

20, 2012, and were released on bond.  All four continue to oppose extradition to the United

States.  Fugitive Claimants Julius Bencko and Sven Echternach still remain at large in their

native countries (Slovakia and Germany respectively), and have refused to come to the United

States and submit to the jurisdiction of the Court.

On August 28, 2014, the fugitive Claimants filed claims to property named for forfeiture

in the Complaint.  (Dkts. 3-8).  On September 1, 2014, Claimant Mona Dotcom, Kim Dotcom's

spouse, filed a claim to some of the same property. (Dkt. 14).

Also pending before this Court is the United States' Motion to Strike the claims of the six

fugitive Claimants and a number of corporations controlled by fugitive Kim Dotcom on the

grounds of fugitive disentitlement.

### STATEMENT OF FACTS

Mona Dotcom has filed a claim for 50% of certain of the assets named in the complaint.

(Dkt. 14).  In her claim, which was signed under penalty of perjury, she stated that "she has a

50% marital interest" in the named assets.  (*Id.*, at 1).  In her Specific Objections and Answers to

the Special Interrogatories, she has stated that her claim to certain assets named in the civil

forfeiture complaint rests on the grounds that under New Zealand law, and specifically, under the

New Zealand Property Relations Act of 1976 (the "PRA"),[1] she is entitled to at least 50% of the

property interest[2] as the spouse of the owner, Kim Dotcom.  (*See* Attachment B, Specific

Objections and Responses of Mona Dotcom, at Response to Questions #3 & #4).  She also stated

in her responses to the propounded interrogatories at question #8 that "I have a 50% marital

---

[1] The PRA is attached to this motion in its entirety as Attachment F.

[2]  Her filed claim, however, is for 50% of the listed assets, and not "at least" that amount. (Dkt.
14, at 1).

2

interest in the various vehicles, real properties, a Computershare account, and other

miscellaneous properties named in the Complaint for Forfeiture in Rem, and I have a 50%

ownership interest in the funds used to purchase each of these properties." (*Id.*, at Response to

Question #8).

Mona Dotcom has stated in her responses to questions #3 and #6 of the Special

Interrogatories that she married Kim Dotcom in Hong Kong on July 10, 2009, and began a *de

facto* relationship with him in November 2007. *Id.* She says she separated from Kim Dotcom on

May 12, 2014, but that they are still married. *Id.* She has further stated that she has no

prenuptial agreement, trust agreement, or any other property agreement that governs the division

of marital property. (*Id.*, at Response to Question #7).

## LEGAL STANDARD

Under Rule G(8)(c) of the Supplemental Rules for Admiralty or Maritime Claims and

Asset Forfeiture Actions, the claim and answer of a claimant is properly stricken if the claimant

fails to establish her standing. *See United States v. $8,440,190.00 in U.S. Currency,* 719 F.3d 49,

57 (1st Cir. 2013) (in a civil forfeiture case, the defendant is the property, and persons raising

defenses to the forfeiture bear the burden of establishing standing to intervene). For that reason,

the claimant's standing is a "threshold issue that must be resolved before addressing an asset

forfeiture claim." *United States v. 14,800.00 in U.S. Currency*, 2012 WL 4521371, *3 (D. Md.

Sept. 28, 2012). Not only does the burden of establishing standing rest ***with the claimant***, it

must also be supported at each stage of the litigation. *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 561 (1992). (emphasis added).

Standing to contest a civil forfeiture action involves two concepts; claimants must

establish both Article III standing and statutory standing. "The term 'statutory standing' relates

to a claimant's ability to show that he has satisfied whatever statutory requirements Congress has imposed for contesting a civil forfeiture action in federal court, while 'Article III standing' relates to the claimant's ability to show that he has a sufficient interest in the property to satisfy the case-or-controversy requirement of Article III of the Constitution." *United States v. 8 Gilcrease Lane,* 641 F. Supp.2d 1, 5-6 (D.D.C 2009). "In order to stand before a court and contest a forfeiture, a claimant must meet both Article III and statutory standing requirements." *United States v. $487,825.00*, 484 F.3d 662, 664 (3d Cir. 2007).

In a civil forfeiture case, a claimant specifically has the burden of proving "a legally cognizable interest in the property that will be injured if the property is forfeited to the government." *United States v. $119.030.00*, 955 F.Supp.2d 569, 575 (W.D.Va. 2013) (citing references omitted). The claimant must "have suffered an injury in fact - an invasion of a ***legally protected interest*** which is (a) ***concrete and particularized*** and (b) ***actual or imminent, not conjectural or hypothetical.***" *Lujan,* 504 U.S. at 560 (internal quotations omitted, emphasis added); *United States v. Lazarenko*, 476 F.3d 642, 649-50 (9th Cir. 2007) (to establish Article III standing, a litigant must show an "actual or imminent injury—not a hypothetical, conjectural, or abstract injury," citing *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)).[3] The injury prong of standing is therefore coextensive with the doctrine of "ripeness," which is "peculiarly a question of timing," *Regional Rail Reorg. Act. Cases*, 419 U.S. 102, 140 (1967). The court's role is not to declare rights in hypothetical cases but to adjudicate live cases or controversies. *See U.S. Const. Art III*. Thus, the doctrine of ripeness is designed to "prevent the

---

[3] *Elk Grove* was abrogated by *Lexmark Intern. Inc., v. Static Control Components*, 134 S.Ct. 1377 (2014) on different grounds from the proposition for which it was cited in *Lazarenko*. *Lexmark Intern. Inc.* 134 S.Ct. 1377. at 1386 reaffirmed that to have Article III standing, the plaintiff must have suffered or be imminently threatened with a concrete and particularized injury in fact (but reversed *Elk Grove* on the question of whether manufacturers injuries fell within the zone of interests protected by the false advertising provision of the Lanham Act).

courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *National Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-808 (2003) (citing references omitted).

In the Fourth Circuit,[4] the claimant bears the additional burden of showing that she has dominion and control over the defendant property – both to satisfy Article III standing and statutory standing under Supplemental Rule G(5)(a)(i).[5]   Dominion and control can be established through "possession, title, [and] financial stake."  But it cannot be established by "bare legal title alone."  *1077 Kittrell Street,* 1991 WL 227792, at *1-2.  Similarly, courts employing the dominion and control test have consistently held the nominees lack standing because they exercise neither dominion nor control.  *See e.g., United States v. One 2005 Dodge Magnum*, 845 F.Supp.2d 1361, 1367-70 (N.D.Ga. 2012).  (holding that bare legal title is

---

[4]  The Fourth Circuit has clearly held that the dominion and control test applies in criminal forfeiture proceedings.  *See United States v. Bryson*, 406 F.3d 284, 291 (4th Cir.2005); *United States v. Morgan*, 224 F.3d 339, 343 (4th Cir. 2000).  The appellate court has similarly employed the dominion and control test in a civil forfeiture proceeding, albeit in an unpublished table decision, and holding, *per curiam*, that a claimant cannot rely on "bare legal title alone."  *See United States v. One Lot of Parcel of Ground Known as 1077 Kittrell Street, Norfolk, VA.,* 1991 WL 227792, at *1-2 (4th Cir. Nov. 7, 1991).  *See also United States v. $119,030 in U.S. Currency*, 955 F. Supp. 2d 569, 577 (W.D. Va. 2013).

[5]  Although two decisions by Judge Posner state that a "bald assertion" is sufficient to establish a claimant's standing (*United States v. $196,969.00 in U.S. Currency*, 719 F.3d 644, 646 (7th Cir. 2013); *United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 653 (7th Cir. 2013), the most recent district court case in the Fourth Circuit specifically rejects these cases as contrary to the law in this circuit.  *See e.g., United States v. $307,970.00*, in U.S. Currency, 2013 WL 4095373 at *3 n.3, and *4 (E.D.N.C. Aug. 13, 2013) ("It is worth noting that district courts within the Fourth Circuit have held that Article III standing is not so easily established as the Seventh Circuit determined it is"; also holding that claim asserting that seized currency was "profits from lawful business ventures" was a bald assertion insufficient to fully answer the special interrogatories and compelling claimants to answer them).

insufficient to confer standing; the "heart" of Article III standing is the existence of an actual injury).[6]

Several district courts in this circuit have granted the United States' motions to strike under Supplemental Rule G8(c) for failure to state a claim under Supplemental Rule G(5).  *See e.g. United States v. $104,250,000 in U.S. Currency,* 947 F.Supp.2d 560, 563-65 (D.MD. 2013); U*nited States v. Various Vehicles. Funds. & Real Properties Described in Attachment A*, 2011 WL 6012424, at *2, 5 (D.S.C. Oct. 25, 2011) (the court, in an unpublished decision, struck claimants' motion to dismiss for failure to file a claim under Rule G(5) and establish statutory standing, although claimants did state in their motions that they owned the cars and properties in question); *United States v. Real Property Located at 5201 Woodlake Drive*, 895 F. Supp. 791, 795, 798 (M.D.N.C., 1995) (the court held that a claim asserting a loan interest in the property, that the court accepted as true, was insufficient without any more facts or documentation to support a legally protected secured ownership; the claim therefore failed to establish Article III standing under the "case or controversy" prong);  *United States v. $18,690.00 in U.S. Currency*, 2014 WL 1379914 (W.D. Va., 2014) (granting the United States' motion to strike and holding that claimant's bare ownership assertion of the seized currency was insufficient to confer Article III and statutory standing)

The Civil Asset Forfeiture Reform Act ("CAFRA"), 18 U.S.C. § 983, defines the term "owner" to mean "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold interest, lien, mortgage, recorded security interest, or valid

---

[6] In the case of seized currency, some courts in this circuit have held that a "bald assertion of ownership" combined with evidence that the property was in claimant's possession is sufficient to satisfy Rule G(5)(a)(i)(B).  *See e.g. United States v. $85,000.00 in U.S. Currency*, 2010 WL 5087910.  These cases are easily distinguishable due to the inherent difficulties of applying the "dominion and control" test to seized cash.

assignment of an ownership interest." 18 U.S.C. § 983(d)(6)(A) (emphasis added). Section 983(d)(6) expressly provides that the term "owner" does not include "a person with only a general unsecured interest in, or claim against, the property or estate of another."  18 U.S.C. § 983(d)(6)(B)(i).

Courts in the United States, including in this circuit, have examined the issue whether a spouse has standing to challenge a forfeiture order based on marital interest, after examining the extant of the spouse's marital interest under state law.[7]  In *United States v. Schifferli*, the Fourth Circuit upheld the district court's decision to dismiss the wife's petition which was based on her marital property interest, for lack of standing, because under South Carolina law, an interest in marital property does not vest until litigation to dissolve the marriage commences.  *Schifferli*, 895 F.2d 987, at n.1 (4th Cir. 1990).

Courts in other jurisdictions have overwhelmingly held that spouses lack standing in civil forfeiture actions where their claim to the property was based on marital property and under state law, their marital property interest had not yet vested.[8]  *See, e.g., United States v. 9844 South Titan Court, Unit 9, Littleton*, 75 F.3d 1470, 1478 (10th Cir.1996) (holding in a civil forfeiture action that a spouse lacked standing where title is held in her husband's name alone because under Colorado law a marital interest only vested upon death or divorce), *overruled on other*

---

[7] Although this question turns on foreign law, courts may ordinarily consider any relevant source in determining foreign law.  *United States v. Mitchell*, 985 F.2d 1275, 1280 (4th Cir. 1993).

[8] The Ninth Circuit held in *United States v. Lester*, 85 F.3d 1409 (9th Cir. 1996) that the wife's community property interest was vested under California state law, and consequently that the government could not forfeit her property interest as substitute assets under 21 U.S.C. §853 (p)). However, *cf United States v. Real Property Located at 148 Maunalanikai Place in Honolulu, Hawaii*, F. Supp. 2d, 2008 WL 3166799, at 7-8 (D. Hawai'i 2008) (dismissing a spouse's marital claim in a civil forfeiture case for lack of standing because in Hawaii, a marital property interest only vests after the evidentiary portion of the divorce proceedings had concluded, and that triggering event had not occurred prior to the spouse filing his claim).

*grounds* by *United States v. Ursery*, 518 U.S. 267 (1996); *United States v. Premises Known as 717 South Woodward Street, Allentown, PA.,* 2 F.3rd 529, 536 (3rd. Cir. 1993) ("In forfeiture actions, federal courts applying the laws of other states have refused to find that a right to equitable distribution of marital property confers ownership independent of a divorce proceeding.") (citing references omitted); *United States v. Kermali*, ___ F. Supp. 2d ___, 2014 WL 6601004 (M.D. FL. 2014) ("The sole issue  . . . is whether, under Florida law, Petitioner has a legal interest in the subject property. *** Petitioner . . . claims that she has a legal interest in the subject property because it was acquired during the course of her marriage and is martial property under Florida law. *** In Florida, however, there is no legal interest in marital assets until a judgment vesting such interest has been entered in a divorce proceeding.")[9]

Here, the claimant has asserted that the New Zealand Property Relations Act of 1976 is the legal basis for her claim that she has a 50% property interest in particular items of restrained property.  But, as detailed below and in the attached sworn affidavit of New Zealand Senior Crown Counsel Dr. Mathew D. Downs (Attached as Exhibit C), Mona Dotcom's interest under New Zealand law is ***unquantifiable*** until she obtains a court order from the courts in New Zealand defining the extent of her marital property – both the amount of the property interest, and in which assets she has an interest.[10]  Additionally, Mona Dotcom has already received assets far in excess of the claim which she seeks to assert in this litigation, and under New

---

[9] *Kermali* was a criminal forfeiture case, but the same considerations apply when determining marital spousal interests.

[10] Section 9 of the PRA (Attachment F) defines separate property as that which was acquired before a marriage (including a *de facto* marriage) began, and which has not been augmented by the application of relationship property.  A determination of what constitutes separate property would necessarily include a determination from the New Zealand courts of when the *de facto* relationship began.

Zealand law, such a transfer would nullify this claim.  (Attachment C, at para. 2).  Thus, any

injury which she may claim at this stage is theoretical and far from imminent.

## ARGUMENT

Claimant Mona Dotcom has not and cannot meet her burden to establish Article III

standing with respect to any of the restrained assets.  In order to have standing, Mona Dotcom

must prove she has a cognizable interest over property in which she exercised dominion and

control.  Because she has not done so (and absent a ruling from the New Zealand courts, cannot

do so), the Court should grant the Plaintiff's motion to strike her claim.

### A.  Mona Dotcom has not asserted any direct ownership interest, nor has she asserted sufficient dominion and control over the assets in her claim

Mona Dotcom does not allege any direct legal ownership of the defendant property in her

claim, with the exception of Vehicle 2. Dkt. 14.[11]  She neither claims to hold title to any of the

claimed properties, nor with the exception of Vehicle 2, states in her claim that she contributed

any of the funds used to purchase the properties.  Nowhere – either in her claim or in her answers

to the United States propounded interrogatories in which defendant was asked to state the legal

and factual basis for her claims - does Claimant assert that she ever had possession of, or

exercised any dominion and control over, the defendant property.  It is undisputed that Mona

Dotcom did not contribute any funds to purchase the assets, as she told the New Zealand courts

(under penalty of perjury) that she has been completely financially dependent on Kim Dotcom

since their marriage and has never worked in New Zealand.  (Attachment D, at para. 8; 14).

---

[11]   *See also* Attachment A, at para. 3-11, noting that Mona Dotcom is neither a listed owner nor cosigner on any of the bank accounts, or the real estate properties, or on any of the purchase or registration documents associated with the vehicles.  Nor has she had any control over the bank accounts used to purchase the properties in her claim.  *Id.*

Mona Dotcom attempts to vary her claim (which claims solely a marital interest in every asset for which she has filed a claim with the exception of Vehicle 2) in her Response to the Special Interrogatories, in which she stated in her response to question #8 that "I have a 50% marital interest in the various vehicles, real properties, a Computershare account, and other miscellaneous properties named in the Complaint for Forfeiture in Rem, and I have a 50% ownership interest in the funds used to purchase each of these properties." (Attachment B, *Id.*).

This belated attempt to improperly amend her claim must fail.  First, she has not met her burden to allege any facts sufficient to show that she has standing – a duty which claimants must undertake at *each* stage of the litigation.  *Lujan*, 504 U.S. at 561.  This is a burden which Mona Dotcom cannot meet since she **refused** to answer the part of Question #8 which asked her the source of funds and the dates which the assets were acquired.  Naked ownership claims are insufficient to establish ownership, as discussed **supra** at pages 5-6.  Supplemental Rule G5 states that the claim must identify and state the claimant's interest in the property. [12]  *See, e.g., United States v. $154,853.00 in U.S. Currency*, 744  F.3d 559, 562-63,  (8th Cir.  2014) (Rule G(5)(a) requires that the claimant's interest in the property "be stated with some level of specificity;" claim making only a bald assertion of ownership and possession may be dismissed). In *$104,250,000 in U.S. Currency*, 947 F.Supp.2d at 564, the district court granted the United States' motion to strike a claim for lack of standing – properly noting that claimant, who was represented by counsel, had made a strategic choice, where the claimant refused to provide details as to the acquisition of the funds, but taciturnly stated that "they were proceeds from the entertainment industry."

---

[12] *See also United States v. Antonelli*, 1998 WL 775055, at *1 (N.D.N.Y. Nov. 2, 1998) (defendant's minor children have no legal interest in property held exclusively in the defendant's name, and therefore have no basis for challenging a criminal forfeiture order even though the property is their residence).

Mona Dotcom has failed to allege facts sufficient to establish that she has dominion and control over the properties and to give her standing to make a claim.  She does not hold title to any of the assets which she has claimed, nor does she make any allegations (outside of her marital property claim) that she is a true owner -- one who exercised dominion and control. Even with respect to Vehicle 2, it is well-settled that mere legal title without dominion and control is insufficient to establish ownership.  *United States v. Vacant Land, etc.*, 15 F.3d at 130. But Mona Dotcom cannot even drive -- and without that ability, it would seem nearly impossible for her to establish that she had dominion and control over the vehicles.  (Attachment E, at 3). *See One 2005 Dodge Magnum*, 845 F.Supp.2d at 1366-68.  That court dismissed a claimant for lack of Article III standing even when she held title to the truck in question.  The court found that the brother was the predominant driver of the truck.  *Id.*  Without having exercised dominion and control over the restrained assets in which she now claims an interest, she cannot establish her Article III standing.  *See Bryson*, 406 F.3d at 291;  *Morgan*, 224 F.3d at 343.

**B.  Mona Dotcom has already received more than any possible marital interest claim from releases from the New Zealand Courts, as well as from a direct transfer to her from Kim Dotcom of assets not restrained by this Court.**

**1)  The Dotcoms' attack on the restraints, both in New Zealand and elsewhere, has resulted in the significant dissipation of much of the restrained assets.**

The Crown Law affidavit explicitly states that if Mona Dotcom were to have received funds from her husband sufficient to satisfy her matrimonial interest, she will receive nothing under New Zealand Law.  (Attachment C, at para. 2).  However, in the past three years, the Dotcoms and other fugitive claimants have drawn down the restrained assets in New Zealand by more than 40%.  As of December 2014, more than NZ$1 million (currently US$770,000) in restrained funds were released to the Dotcoms as "living expenses" by the New Zealand courts.

An additional approximate NZ$6 million (currently US$4.64 million) in legal fees have already been released to the Dotcoms.[13]   Mona Dotcom has benefitted from the attacks on the restraints and has continued to enjoy a lavish lifestyle as a result.

This situation has been exacerbated by both the expenses incurred during additional delays that the fugitive Claimants have sought and received prior to the initial extradition hearing, as well as additional requests for releases of funds.  Perhaps most troubling, on December 23, 2014, Kim Dotcom filed a request with the New Zealand courts to release "further legal expenses," which are undefined but clearly are likely to be in the millions, and "living expenses," which he asserts are well over NZ$100,000 (currently US$77,000) per month.  Mr. Dotcom has sought a hearing in New Zealand on the additional release of funds for January 15, 2015 at 10:00am (January 14, 2015 at 4:00PM EST), which is two days before the hearing in this Court on the Motion to Strike his claim to those same assets.

Yet on the same day (December 23) in which Kim Dotcom filed a request with the New Zealand courts through New Zealand counsel, his U.S. counsel sought a consent extension with this court in complying with this Court's order compelling claimants' response to the special interrogatories, citing a difficulty in coordinating with claimant's foreign counsel over the Christmas and New Year's holiday.  Dkt. 58, at 2.  Clearly, the Dotcoms have made a strategic choice.  Kim Dotcom and his codefendant claimants have delayed and opposed answering the Special Interrogatories, while his spouse, Mona Dotcom who is ably represented by New

---

[13] Claimants (including to a lesser extent Mona Dotcom) have engaged in numerous New Zealand legal proceedings, so it is not clear exactly how much of the spending on legal fees has been for Mona Dotcom's benefit.  Mona Dotcom has clearly already received millions of dollars in proceeds of the Mega Conspiracy's criminal conduct.  The Government believes that the exact number is not critical, given the analysis herein.  Of note, some of the fugitive Claimants have also received releases for various reasons from courts in a number of countries, including New Zealand, Germany, and Hong Kong.

Zealand and U.S. counsel, has inexplicably failed to file a claim or answer the Special

Interrogatories in a manner sufficient to state an ownership interest.  Though represented by New

Zealand domestic property counsel, and thus presumably aware that New Zealand courts would

require a hearing (or even an agreement) in order to adjudicate her property interest, Mona

Dotcom has not yet instituted such proceedings.  The Dotcoms have clearly made a strategic

choice to delay the proceedings in the United States as much as possible while attacking the

criminal restraints in New Zealand and elsewhere, so as to continue to enjoy the extravagant

lifestyle funded by Kim Dotcom and his codefendants' criminal offenses.  With each day, the

restrained funds in New Zealand and elsewhere risk significant depletion, and eventual

exhaustion.[14]

> 2) **Kim Dotcom's transfer to Mona Dotcom of significant unrestrained assets makes clear she has no possible claim to the restrained funds.**

Kim Dotcom, like several other fugitive Claimants, has long been trying to convert the

intellectual property of the charged Mega Conspiracy into unrestrained assets.  For example, Mr.

Dotcom converted the Megabox.com project,[15] that was part of the criminal charges in the

---

[14] These attacks on the restraint harm the New Zealand courts' eventual valuation of Mona Dotcom's marital interest.  Section 2G of the PRA (attached as MD-2 to the Crown Law affidavit) states that the value of the property is to be determined as of the date of the hearing of that application by the court of first instance (unless the court exercises its discretion to decide that the value of the property is to be determined at another date).  But Section 47 of the PRA provides that agreements, dispositions, or other transaction between spouses and partners with respect to their relationship property and intended to defeat creditors of either spouse is void against those creditors.  *See also Crown Law Affidavit*, paragraphs 15; 21-24.  Mona Dotcom and Kim Dotcom, in attacking the restraints, have evidently engaged in a strategic tactic intended to deplete the assets without reaching a marital property settlement agreement that New Zealand courts would set aside as impermissibly resulting in defeating creditors (including the Crown).

[15] In approximately September 2013, Dotcom renamed Megabox.com as Baboom.com. *See* "Kim Dotcom Teases New Music Service . . . Baboom", Torrentfreak.com (September 7, 2013) ("December 2011, a month before the criminal proceeding against Megaupload became public, Kim Dotcom first revealed his plans to launch a new service to transform the music business.  At

indictments before this Court,[16] into payment.[17]  Similarly, Mr. Dotcom and other defendants

have created a web-based service Mega.co.nz that provides similar operations to

Megaupload.com with some technical provisions, installed at the apparent direction of legal

counsel, that Kim Dotcom apparently believes will make it more difficult to prove the

knowledge of the fugitive Claimants, but that have apparently contributed to it becoming a

"piracy haven."[18]  Kim Dotcom has apparently sold many millions of dollars in shares in this

business to at least eight different shareholders.[19]

---

the time the project was called Megabox and the similarly named .com domain was seized by the
U.S. Government. However, despite all the legal troubles, Dotcom continued development on the
music platform. It's currently being prepared for a public launch, albeit under a different brand.
Dotcom had decided initially decided to keep the new name a secret for a while, but after he
resigned from Mega earlier this week there were several signs suggesting that it could be
"Baboom."  TorrentFreak presented the Internet entrepeneur with these findings, and Dotcom
confirmed that the new service will indeed launch at Baboom.com."); Chris Keall, "Kim
Dotcom's answer to Spotify and iTunes—Baboom—will soft launch on Monday,"
ArsTechnica.com (January 19, 2014) ("Kim Dotcom's major 'Party Party' at Auckland's Vector
Arena may have been cancelled, but the mogul is still going through with a 'soft launch' of
Baboom, the soon-to-be music service formerly known as Megabox.");
http://static.baboom.com/developers/recruitment.pdf ("We are associated with the same group
behind MEGA (Megaupload successor as Wikipedia states), and responsible for the upcoming
music service BABOOM.")).

[16] Megabox.com was described in the January 5, 2012 Indictment (paragraphs 27, 69(www), and
69(iiii)) and the February16, 2012 Superseding Indictment (paragraphs 28, 73(kkkk), and
73(xxxx)).

[17] Andy, "Kim Dotcom & Baboom Sever All Ties," Torrentfreak.com (Oct. 2, 2014) (noting that
Dotcom's trust sold 45% of Baboom, when a 11.5% of ownership stake was soon thereafter
valued at US$3.98m (NZ$5.05m)).

[18] *See* Ernesto, "Report Brands Dotcom's Mega a Piracy Haven," Torrentfreak.com (Sept. 18,
2014).  The report entitled "BEHIND THE CYBERLOCKER DOOR: A Report on How
Shadowy Cyberlocker Businesses Use Credit Card Companies to Make Millions," is available at
http://www2.itif.org/2014-netnames-profitability.pdf.

[19] The largest share of the company Mega Limited (18.8%) was apparently purchased by
William Yan (a/k/a Bill Liu).  *See* "Dotcom: I had no idea Liu had any problems," New Zealand
Herald (Aug. 25, 2014).  Those shares were seized by the New Zealand government, as part of
an apparent domestic investigation into the importation of pseudoephedrine and money

Kim Dotcom has stated that he has transferred all of the assets not restrained in the criminal matter and proceeds of his "new" businesses into a trust controlled by his wife, Mona Dotcom.[20]  While the Government has yet to see the documents associated with the trust, the 17% stake in Mega Limited reportedly given by Dotcom to his wife are worth, according to published reports, approximately NZ$35 million alone.[21]  This gift, combined with the apparent proceeds of previous sales of stock in Mega Limited and Baboom,[22] means that Mona Dotcom has been provided and still controls assets well in excess of the approximately NZ$23 million she is trying to claim in this proceeding as her marital assets.[23]  Because she has already been provided those assets, her claim that she is still owed half the interest in Kim Dotcom's restrained assets cannot be established under New Zealand law.  *See* Exhibit C at ¶ 2 ("The

---

laundering.  *Id.*  Kim Dotcom and Mega Limited have claimed that they knew nothing about these issues.  *Id.*

[20] Kim Dotcom, as part of the civil restraint process in the New Zealand courts related to the private suit against him and other indicted individuals and entities also before this Court, has had to detail his current unrestrained assets.  Much of those proceedings are under seal, and the U.S. Government has not been provided with a specific accounting of his unrestrained assets, but Kim Dotcom has admitted:  "But let me add, as of today, I don't have a single share in Mega.  You know, the family trust that controls the shares in Mega is now completely in the control of my wife and my five children, who are all the beneficiaries.  And I had to do that, and I was happy to do that, because Hollywood has tried to attack the new assets that were generated after the raid.  So, as you know, the U.S. government has seized everything, you know, that was created up until the raid, all monies, all valuables were seized in all different jurisdictions, and after I started the Internet Party and invested in a political movement, the MPAA then started suing me civilly to try and have those assets restrained as well, and that is the situation I'm in.  So, I'm officially broke right now."  Kim Dotcom, Unbound Digital (Nov. 25, 2014), available at https://www.youtube.com/watch?v=68-PYA7uuGI.

[21] *See,e.g.,* Laura Walters, "Kim Dotcom's wife axed from companies before split," Stuff.co.nz, May 19, 2014.

[22] The sale of Mr. Yan/Liu's 18.8 percent stake, referenced above, would seem to have generated a similar sum of money for the Dotcom trust.

[23] David Fisher, "Mona Dotcom files claim for $23m: Dotcom's estranged wife in legal fight for half of everything seized in raid on mansion," New Zealand Herald (Oct. 25, 2014).

analysis presupposes that the wife's matrimonial property claim has not been, and cannot be, satisfied without recourse to the property the Crown is seeking to forfeit.  If she has already received funds from the husband to satisfy her matrimonial interest, she will have no claim at all.").

> **C. Mona Dotcom has neither yet establishished a marital property interest in New Zealand sufficient to confer standing -- nor is she likely to establish a valid claim under New Zealand law.**

Mona Dotcom's claim states that she has "a 50% interest as the spouse of the owner, Kim Dotcom."  But under New Zealand law, her marital interest is unquantifiable absent a court order, and establishing such an interest lies in the discretion of the New Zealand courts.  As the legal affidavit from New Zealand indicates (Attachment C, at Para. 15 -16), it is unlikely that a New Zealand court would grant Mona Dotcom any relief.

First, New Zealand courts have consistently refused to allow even innocent claimants who were ignorant of the illegal conduct to retain criminal proceeds.  (Attachment C, at  Para. 15, 24, and 35).   Second, any interest that Mona Dotcom may have in untainted assets is unquantifiable at present; equal sharing is merely a starting point, but is by no means determinative.  (Attachment C, at Para. 16, 29-31).   It is thus uncertain that Mona Dotcom has a 50% marital interest at all, much less a marital property interest in these particular properties.  Third, she will have to show that she has not unlawfully benefitted from significant criminal activity in order to recover any interest in the properties to be forfeited.  (Attachment C, at Para. 25).  Finally, Section 20A of the PRA not only preserves creditors' rights, but it specifically provides that the PRA does not limit creditors (which include the government) from satisfying their debts from marital assets.  (Attachment C, at 19-24).

### 1.   **Mona Dotcom's property interest is as yet unquantifiable.**

Assuming, *arguendo*, that these assets are untainted, Mona Dotcom does not yet know

the extent of any property interest she may have.  Since her claimed basis for invoking this

court's jurisdiction[24] is that the property is relationship property, it is her burden to prove that it

is relationship property as opposed to separate property (since Section 9 of the PRA provides that

property acquired while not married or as de facto partners may be considered separate property,

as well as property that is acquired out of the proceeds of separate property (subject to exceptions

within the PRA).

Moreover, as the Crown Law Affidavit states at paragraph 16, the New Zealand Courts

would have to examine a variety of factors to quantify her property interest, which at present, is

unquantifiable.  In making an order determining the nature of her property under Section 66(1) of

New Zealand's Criminal Proceeds Recovery Act  ("CPRA"), the court would use the application

of the PRA as a *relevant, but not necessarily determinative consideration*.  Equal sharing will not

necessarily be the result.  Exhibit C, at para. 30.  Factors would include "the nature and extent of

any legal or equitable interest in the property […], the probable outcome of a claim under the

PRA, the hardship considerations under Section 67 of the CPRA which overlap with those under

Section 66, and the statutory purpose of the CPRA."  Exhibit C, at para. 31.

Even if the PRA were the only determination, its application in these circumstances is

murky and this court's application of the PRA factors would require a domestic relations trial.

Although the PRA has a presumption of equal sharing (Section 11); this presumption is modified

---

[24] Mona Dotcom seems unsure herself that this court has jurisdiction over her claim.  In the first
paragraph she states that her appearance does not constitute "consent to the jurisdiction of this
court, or any other court."  (Dkt. #14, at 1).  Although she cites to Rule E(8) of the Supplemental
Rules, this language is nowhere to be found in the Supplemental Rules of Civil Procedure.
Claimants in forfeiture actions normally *appeal* to the jurisdiction of this court.

by several sections, which Mona Dotcom herself cites in her answers to the Special

Interrogatories.  (Attachment B, at Response to Question #5).  For example, Section 13 of the

PRA has an exception to the PRA for equal sharing under extraordinary circumstances, and

Sections 15-18 (to which Mona Dotcom also cites in her answers to the Special Interrogatories)

apply to either spouse and are meant to address situations which may call for an exception to

equal sharing either because of economic disparities, differing contributions of spouses,

misconduct of a spouse, or compensations for contributions or dissipation of relationship

property after separation.

One example serves not only to illustrate the complicated factual and legal questions

which a New Zealand court would consider in making a marital property award, but also to show

why Mona Dotcom's claim that she is entitled to 50% of the claimed assets under the New

Zealand PRA is not a foregone conclusion.  Under New Zealand law, relationship property

begins from the beginning of the *de facto* relationship, and not from the beginning of marriage.

(Section 2B of the PRA).   In her Special Interrogatories (Attachment B, responses to questions

#3 and #6), which were sworn under oath and on the advice of her New Zealand marital property

counsel, Mona Dotcom claims that she began her *de facto* relationship in November 2007.  But

in her February 28, 2012 affidavit to the New Zealand courts, Mona Dotcom claimed that "she

met Kim" in November 2007.[25]  (Attachment D, at para. 3).  Divorce records from Guam

---

[25] Section 2D of the PRA (Attached as MD-2 to the Crown Law Affidavit), lists many factors
which the courts in New Zealand would apply in determining whether a de facto relationship
exists, including the nature and extent of common residence, whether a sexual relationship exists,
the degree of financial dependence, and the degree of mutual commitment to a shared life.
While it is impossible to predict how a court in New Zealand would rule at this juncture in
adjudicating Mona Dotcom's marital property interest, it is doubtful that a court would conclude
from the application of these factors that just "meeting" someone for the first time serves to
begin a *de facto* relationship, and it is similarly unlikely that the court in New Zealand would
conclude that someone was in a *de facto* relationship with someone before their legal separation

pertaining to Kim Dotcom's first marriage to Lovely Roann Ronda Vargas show that the then-Kim Vestor and Lovely Vargas married on 25 August 2007, just a few months earlier; had a child with Lovely Vestor in 2007, shortly before Mona Dotcom claims that she first met Kim Dotcom; and did not separate from his first wife until September 2, 2008 (with the divorce being final in May 2009) (Appendix 1 to Attachment A).

Additional facts from Mona Dotcom's public statements further undermine her claim to this Court of a *de facto* marriage beginning in November 2007.  Mona Dotcom gave an interview to Woman's Day Magazine, which was published in New Zealand.  See Attachment E.  In the article, Mona Dotcom indicated that she had met Kim Dotcom in the Philippines.  She says he "was living with another Filipino woman, who he went on to marry in Hong Kong when she was pregnant with his first child." *Id*.  Mona Dotcom claims she resisted his entreaties:  "I didn't want it.  I walked away.  He had a girlfriend and she was my friend." *Id*.  Mona Dotcom claims that "only later, after [the child's] mother returned to Manila from Hong Kong" did she initiate her relationship with Kim Dotcom and move "into his vast penthouse on top of the Grand Hyatt hotel." *Id*.  Mona Dotcom indicated that their first child was born "shortly after the couple's surprisingly simple wedding in Hong Kong." *Id*.

Mona Dotcom's statements to the New Zealand press, as well as the Guam divorce records undermine her sworn statement to this court that her *de facto* relationship began in November 2007.  According to Section 2A and 2AB of the PRA (and the dictates of reason), one has a marital interest between *two spouses or civil partners*, *not three*.  Section 2F of the PRA states that the relationship property is determined at the end of the marriage (or the date of separation).  Since Kim Dotcom and Lovely were not separated until September 2008, Mona

---

from their first spouse.  Under Section 2F of the PRA, the shares in relationship property are to be determined on the date that their marriage ended.

Dotcom may not use the date "when she met Kim Dotcom" to establish a *de facto* marital interest that is coextensive with that of Kim Dotcom's first wife.  Moreover, Mona Dotcom claims to the press that she waited until Lovely Vestor separated from Kim Dotcom on September 2, 2008; so, she could not have established a *de facto* marriage in November 2007.[26] Second, her first child was born in early 2009 and not after the date listed on her marriage certificate (July 10, 2009) and submitted to this Court in the answers to the Special Interrogatories.  (Attachment A, at para. 10).   Such inconsistencies would make her ability to establish her marital interest case in New Zealand that much harder.

It is therefore especially striking that, in light of all these circumstances, Mona's claim states, without explanation, that she is relying on the advice of her New Zealand domestic property counsel in making the simple taciturn statement that these assets are "relationship property."  Notwithstanding that it is *claimant's* burden to establish standing, the United States propounded Special Interrogatories designed to ferret out her standing.  To that end, Question #3 of the Special Interrogatories asked her to specify both "the factual and legal basis to support these claims."  (Attachment B, *Id.*).  Mona Dotcom stated (without explanation) that she has "at least a 50% interest in the relationship property" even though she has retained marital property counsel in New Zealand who advised her on making the claim, as well as several sets of United

---

[26] However, she also claimed to the press that her first child was born after her and Kim Dotcom's wedding in Hong Kong.  This is contradicted by the child's birth certificate, which was registered several months earlier.  The date on the child's birth certificate predates Kim Dotcom's divorce from his first wife by several months.  It is possible that a New Zealand court would find that the first child's birth began the *de facto* relationship with Mona Dotcom and her property interest began on that date, but this analysis is complicated by the fact that according to the Marriage Property Settlement Agreement entered between Lovely Roann Vargas and Kim Dotcom, Lovely Roann Vargas retained a separate property interest in all property acquired by her after their separation date of September 2008 through the date of the divorce.  (Attachment A, Appendix 1, at p. 12, para. 7).

States counsel knowledgeable in United States forfeiture laws.  Thus, her refusal to provide details necessary to establish standing is a "strategic choice."

Similarly, Question #8 of the Special Interrogatories asked Mona Dotcom to state the source of the funds used to purchase each of these properties, and the date the asset was acquired – inquiries which are necessary under the PRA to establish whether the properties were marital property or separate property - she refused to answer that part of the Interrogatory.  *Id. at* question #8.

The court held in *$104,250.00 in U.S. Currency*, 947 F.Supp.2d at 565, in dismissing the claimant's claim under Rule G8 for lack of standing because it stated a bare claim of ownership (that the seized currency was "investments" in the entertainment industry and were also "proceeds" of her mother's estate), without proffering more details that:

> Justice is not served by forcing the Government to engage in multiple rounds of discovery before it can hone in on the facts the Claimant is offering to establish her standing to contest the forfeiture.  Too much time is wasted in civil forfeiture as the parties parry the threshold issue of standing.  Indeed, the prosecution of this case has already been delayed for more than five months…and the Government's acquiescence in her requests for additional time [have resulted in] Claimant us[ing] the additional time to add a single sentence that is a study in vagueness to her Verified Claim.

This statement rings especially true here.  At nearly every opportunity, the United States has acquiesced to claimants' requests for more time, time which claimants have used to attack the restraints at full speed *and under seal* (including the most recent hearing on the restraints in New Zealand, which has been set for less than 48 hours before this Court's hearing), while responding to the United States' Interrogatories with objections.

Although courts have given claimants more time to comply with the rules by filing an amended claim, courts have properly refused to do so in cases such as this one where the claimant is represented by counsel, and "has made the strategic choice" to not comply with the

rules. *Id.,* at 565;  *see also United States v. $18,690.00 in U.S. Currency*, 2014 WL 1379914, at

*3 (striking claimant for lack of Article III standing where his claim and answers to special

interrogatories did nothing more than make a bare assertion of ownership), noting that:

"[claimant] is not a *pro se* litigant putting forth a good faith effort to interpret a vast array of

federal statutes, rules, and case law.  [Claimant] is represented by counsel.  By failing to file a

valid claim, and by failing to remedy that failure in either of his responses to the Government's

special interrogatories, he has therefore apparently made a 'strategic choice.'" (citing to

*$104,250.00 in U.S. Currency, Id.*)

### 2.   Under New Zealand Law, Mona Dotcom may not ultimately have *any* claim to these assets.

Whatever the New Zealand courts ultimately determine Mona Dotcom's marital interest

to be, New Zealand courts have consistently refused to allow even an entirely innocent and

unaware spouse to retain any interest in criminal proceeds.  Attachment C, at para. 15.  The

Crown Law affiant conducted a detailed search and did not find *a single case* in New Zealand in

which courts have allowed a spouse to retain tainted assets on the basis of a marital interest.

Attachment C, at para. 24.  Section 47 of the PRA limits the wife's ability to assert a marital

interest in order to defeat creditors (including the government); creditors have a right to go after

marital assets to satisfy the debts of a spouse.  Attachment C, para. 21-22; 24.  As the New

Zealand Supreme Court observed in *Solicitor-General v. de Bruin* [2008] NZSC 32 (attached as

MD-4 to Attachment C), at para. 5 "Tainted at purchase by Mr de Bruin's crimes, the property

could not pass untainted from him, save to the extent of Ms Delaney's untainted contributions."[27]

---

[27] 18 U.S.C. § 981(f) similarly states that all right, title, and interest in property vests in the
United States upon commission of the act giving rise to forfeiture under this section.

In order to establish a marital interest in the *untainted* assets under New Zealand law,

Mona Dotcom would have the burden to establish under Sections 66 and 67 of the CPRA on "the

balance of probabilities" (which under New Zealand law means more likely than not;

Attachment C, at para. 14), that "she has not unlawfully benefitted from significant criminal

activity." Attachment C, at para. 15; 25-31. Factually, Mona Dotcom would have a particularly

difficult time in establishing her complete ignorance of Kim Dotcom's illegal activities in the

New Zealand courts. In an affidavit submitted to the High Court of New Zealand, Auckland

Registry, dated February 28, 2012, Mona Verga Dotcom stated: "I have had no involvement in

the Megauploads businesses. I do not have a Mega account and I have never been an employee

of or in any way involved in these businesses." *See* Attachment D, para. 23.

Contrary to her representations to the New Zealand court, Mona Dotcom, then known as

"Mona Verga," was one of the incorporators of the "Megateam Corp." in the Phillipines,[28] which

was tasked by the Conspiracy to review and sometimes hide copyrighted content available on the

Mega Sites.[29] In testimony before the New Zealand High Court, Kim Dotcom said that

---

[28] Megateam Corp. is a corporation registered in the Phillipines, with a Company Registration No. CS200815603. Among the five incorporators are "Tim Vestor" and "Mona A. Verga", which are known aliases for Kim and Mona Dotcom. Attachment A, at para. 14-15.

[29] There are numerous references to the Megateam auditors in the Introduction and Summary of Evidence against the Defendants," publicly released on November 22, 2013, available at http://www.justice.gov/usao/vae/megaupload.html at ¶ 103rr ("but it's good to stay off the radar by making the front end look like crap while all the piracy is going through direct links & embedded. … the important thing is that nobody must know that we have auditors letting this stuff through."); ¶ 74b (instructions for auditors telling them to set to "private", rather than delete, "[l]ong length high quality videos that are obvious [and] Video with known logos / website URL's in it of copyright holders"); ¶ 103ss (I also have a meeting with the auditors tomorrow evening, I always pointed out to them how important it was that all big hollywood stuff needs to go [from the public viewable video listings], but apperantly [sic] they're not doing a good job."); ¶ 105(j) ("youtube videos are already audited, some videos that were imported by users were 'sexy' but there's never real nudity on youtube.").

Megateam was a "100% subsdiary of Megaupload." (Attachment A, at para. 14) Far from

having "no involvement in the Megaupload businesses," as she told the New Zealand High Court

under oath, (Attachment D, at para. 23) Mona Verga Dotcom contributed, at least in name, to the

operations of the Mega Conspiracy, as early as 2007.

Her claim that she did "not have a Mega account" may be technically correct, since she

actually had <u>six</u> separate accounts associated with two of her personal email addresses.

(Attachment A, at para.13).  But these facts, which suggest that she was in fact an avid user of

the Mega sites, makes any claim that she did not know the illegal nature of her husband's

business difficult to sustain.[30]

In New Zealand, as in the United States, the government must first establish that the

offender has unlawfully benefitted from criminal activity.  However, in the United States' civil

forfeiture regime, the government must establish by a preponderance of the evidence that the

proceeds are tainted.  *See* 18 U.S.C. § 983(c).  By contrast, in New Zealand, the Crown may

choose to enter a "profit forfeiture order" under Section 6(3) of the CPRA.  In that case, a

reverse-onus provision governs (similar to that in place pre-CAFRA in the United States)[31] –

once the Crown has proven that the offender has unlawfully benefitted from significant criminal

activity, the value of that benefit is presumed to be whatever sum the Crown specifies in its

application unless the offender is able to rebut that presumption on the balance of probabilities.

(Attachment C, at para. 13-14).  Mona Dotcom has failed to even attempt to make a showing

---

[30]  Mona Dotcom's claim that she had no knowledge of her husband's illicit activities is belied by her claim filed in this court to several vehicles, which have vanity license plates such as "Guilty", "Mafia", "Evil", and "Hacker."   (Dkt. #14, at 2-3).  Her husband's lack of discretion arguably put Mona Dotcom on notice to inquire as to the sudden source of her husband's wealth.

[31]  *United States v. Property, Parcel of Aguilar*, 337 F.3d 225, 232 (2d. Cir. 2003) (pre-CAFRA, the standard of proof was preponderance of the evidence, but the burden was on the claimant rather than the United States).

that these assets are not tainted, when she is aware that under New Zealand law it would be her burden to do so.  Moreover, it is disingenuous for her to suggest to this court that her marital interest would be sufficient to allow her to state a claim under New Zealand law when there is *not a single case* which affords even innocent spouses the ability to assert a marital claim in tainted property.  Even as to untainted property, it would be Mona Dotcom's burden to show that she has not knowingly benefitted from significant illegal activity.

> **3.   Although Mona Dotcom cannot show that she has standing now, she has a later opportunity to challenge the forfeiture order in New Zealand.**

As the Crown Law affidavit states at para. 10, Mona Dotcom will have six months from the date of a forfeiture order being registered in New Zealand to seek relief.  By that time Mona Dotcom may well have obtained a property order or a ruling from the New Zealand courts detailing the nature of her property interest, if any.  Even if she hasn't, the High Court in New Zealand, when ruling on her challenge to the forfeiture order, will be able to make a ruling that determines her share of the property.  Attachment C, at para. 30 -31.   Absent such a determination, Mona Dotcom's interest is hypothetical, and insufficient to confer Article III standing.  The Ninth Circuit confronted a similar issue in *Lazarenko*, 476 F.3d at 649-50.

In that case, the United States seized Ukrainian bonds and funds under a civil forfeiture seizure warrant as proceeds following the defendant's conviction for money laundering. Liquidators of the offshore bank (Eurofed) answered the complaint as the assets were held in the name of that offshore bank, and the High Court of Antigua had appointed the Liquidators to collect and distribute Eurofed's assets to its depositors and creditors (which included defendant Lazarenko).  Notwithstanding the fact that Eurofed Liquidators had more than a colorable property interest in the funds, the Ninth Circuit held that the injury requirement for Article III

standing and ripeness ultimately sounded the death knell for Liquidator's interlocutory appeal, because "whether the seizure actually injures Liquidators is conjectural or hypothetical because it depends on the district court's findings on who possesses superior title…" *Id.*, at 650. Moreover, Section 853(n)'s ancillary proceeding requirement – during which time they may present all their claims and defenses – adequately protects their interest.[32]

Similarly in this case, the determination of Mona Dotcom's property interest will require a trial, which would require the presence of Kim Dotcom himself, who has demonstrated in any case that he is unwilling to travel to the United States.  Until the New Zealand courts determine the extent of Mona Dotcom's marital interests -- and in which assets she has a marital property interest -- any injury that Mona Dotcom may suffer as a result of the dismissal of her claim is conjectural.  Mona Dotcom is in a similar position to Liquidators in *Lazarenko*  - she cannot establish Article III injury because she cannot demonstrate why the ancillary proceedings in New Zealand, in which her witnesses would likely reside, are inadequate to protect her interest in adjudicating her competing claim to the property.  *Id.* at 650-651.  Unlike Lazarenko, many of the witnesses (including Kim Dotcom) have demonstrated that they *will not* travel to the United States for any purpose; thus, this Court would find it nearly impossible to conduct such a factual hearing.

---

[32] Counsel for the United States stated at oral argument that Liquidators would be entitled to pre-judgment interest should they prevail on their Section 853(n) claim, a factor which is not present here.  *Id.* at 649, n.1.  But under New Zealand law, marital assets may be reached by creditors as stated *supra* – New Zealand law similarly affords a remedy under Section 20E of the PRA which provides compensation for the dissipation of marital assets by creditors out of the debtor spouse's separate property or by an otherwise greater award of marital property (or alternatively, under Section 18C which Mona Dotcom herself cites in her Special Interrogatory answers at question #5 (Attachment B)).  In any case, Mona Dotcom cannot demonstrate her entitlement to a greater property interest under United States law that that which she may assert under New Zealand's.

**CONCLUSION**

Mona Dotcom's claim is insufficient to give her standing because she cannot establish any concrete injury.  Until the New Zealand courts quantify whatever property interest she may have, the nature of her property interest is at best, inchoate and murky.  Nor has she established any facts sufficient to allege an ownership interest.  Significantly, Mona Dotcom has not yet even begun the process to obtain a judicial determination from New Zealand.  That lack of action demonstrates claimants' strategy to seek delay of a judicial resolution of the criminal and civil cases in this Court, while pressing the New Zealand courts to continue releasing the restrained assets.   Should this court delay ruling until Mona Dotcom has obtained such a determination, the restrained assets will likely be gone.  Mona Dotcom, on the other hand, will suffer no prejudice by seeking a determination of her property interest in New Zealand: she has six months to present her claim to the New Zealand courts after the registration of any forfeiture order that this Court may enter.  For the reasons stated above, this Court should therefore strike her claim for lack of standing under Supplemental Rule G(8).

Respectfully submitted,

Dana J. Boente
United States Attorney

By:      _____/s/_____
         Allison Ickovic
         Special Assistant United States Attorney
         Jay V. Prabhu
         Chief, Cybercrime Unit
         Assistant United States Attorney
         Karen Ledbetter Taylor
         Assistant United States Attorney
         G. Wingate Grant
         Assistant United States Attorney
         Attorneys for the United States of America
         United States Attorney's Office
         Justin W. Williams U. S. Attorney's Building
         2100 Jamieson Avenue, Alexandria, Virginia 22314
         Phone: (703) 299-3700
         Fax: (703) 299-3981
         Email Address: allison.b.ickovic@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of December 2014, I electronically filed the

foregoing with the clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to all counsel of record.


      /s/
_____

Allison Ickovic
Special Assistant United States Attorney
Attorney for the United States of America
United States Attorney's Building
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia  22314
Phone:  703-299-3700
Fax:  703-299-3982
Email Address: Allison.B.Ickovic@usdoj.gov