

FILED

FEB 27 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

UNITED STATES OF AMERICA,
               Plaintiff,

    -v-

ALL ASSETS LISTED IN ATTACHMENT A, AND
ALL INTEREST, BENEFITS, AND ASSETS
TRACEABLE THERETO,
               Defendants *in rem*.

Civil No. 1:14-cv-969

Hon. Liam O'Grady

## MEMORANDUM OPINION

Before the Court is the government's motion to strike the claims of Finn Batato

("Batato"); Julius Bencko ("Bencko"); Kim Dotcom ("Dotcom"); Sven Echternach

("Echternach"); Bram van der Kolk ("van der Kolk"); Mathias Ortmann ("Ortmann"); and

Megaupload Limited, Megapay Limited, Megamedia Limited, Megastuff Limited, and Vestor

Limited ("the corporate claimants"). *See* Mot. to Strike, 1. In this civil *in rem* action, the United

States seeks forfeiture of the assets listed in Attachment A to the complaint. All of the assets

identified in Attachment A are located either in Hong Kong or New Zealand.

The government filed a verified complaint for forfeiture *in rem* on July 29, 2014. (Dkt.

No. 1). On August 28, 2014, claims to the assets were filed by Batato, Bencko, Dotcom,

Echternach, van der Kolk, Ortmann, and the corporate claimants. (Dkt. Nos. 3-9). On October

10, 2014, the claimants filed a motion to dismiss the forfeiture complaint or in the alternative

stay the forfeiture action. (Dkt. No. 19). The government then filed a motion to set a briefing

schedule, asking the court to consider the government's motion to strike before ruling on the

1

motion to dismiss. (Dkt. No. 31). The court granted the government's request. (Dkt. No. 32). On November 18, 2014, the government moved to strike the claims of the claimants. (Dkt. No. 39).[1] The claimants opposed the motion and the government replied. (Dkt. Nos. 45, 46, 48, 66, 67).

## I. BACKGROUND

On January 5, 2012, indictments were entered in this district against Batato, Bencko, Dotcom, Echternach, van der Kolk, Ortmann, Megaupload Limited, and Vestor Limited.[2] *See* Complaint, ¶ 16. The indictment charged the defendants with multiple crimes, including conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d); criminal copyright infringement in violation of 17 U.S.C. § 506 and 18 U.S.C. § 2319; conspiracy to commit copyright infringement in violation of 18 U.S.C. § 371; aiding and abetting of copyright infringement in violation of 18 U.S.C. § 2; and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). On February 16, 2012, a superseding indictment was returned, adding wire fraud charges under 18 U.S.C. § 1343. *See* Superseding Indictment. In summary, the government alleges that the indicted defendants operated a scheme known as the "Mega Conspiracy," an international criminal conspiracy to profit from criminal copyright infringement and launder the proceeds. *See* Complaint, ¶ 2. The government asserts that the assets listed in Attachment A constitute proceeds of the conspiracy and are thus subject to forfeiture. *Id.* at ¶ 3.

On January 13, 2012, the New Zealand Ministry of Foreign Affairs and Trade received requests from the United States seeking the provisional arrest of the individual defendants in the

---

[1] The government originally filed its motion to strike on November 17, (Dkt. No. 37), but was asked by the Clerk's Office to refile the motion due to an error involving a signature on the original document.

[2] An additional individual, Andrus Nomm, was named in the indictment and the civil forfeiture complaint. *See* Complaint, ¶ 14; Indictment, ¶ 1; Superseding Indictment, ¶ 37. Nomm was arrested on February 9, 2015 and pled guilty to conspiracy to commit copyright infringement on February 13, 2015. He agreed to forfeit any assets obtained through the conspiracy to which he had an interest. Nomm was sentenced to one year and one day in the penitentiary and no fine. To date, he is the only one of the defendants in the criminal action to have been arrested by U.S. authorities. Case No. 1:12-cr-00003.

criminal action for the purpose of extraditing them to the United States. *See* Affirmation of

Bethany Ellen Madden, ¶ 2. On or about January 20, 2012, New Zealand authorities arrested

Batato, Dotcom, Ortmann, and van der Kolk. *See* Declaration of FBI Special Agent Rodney J.

Hays. They were released on conditions of bail. Bencko remains in Slovakia, his country of

citizenship. Echternach is also in his country of citizenship, Germany.

On April 18, 2012, the New Zealand High Court[3] registered in New Zealand two

restraining orders issued by this court, subject to conditions including monthly living allowance

payments for Dotcom, his wife, and van der Kolk. *See* Order for Registration of Foreign

Restraining Orders. The restraining orders were to expire on April 18, 2014. The New Zealand

Court of Appeal issued a ruling extending the registration of the U.S. restraining orders to April

18, 2015. The evidence before this Court indicates that New Zealand law does not provide for

further extension of the restraining orders.

## II. SUBJECT MATTER JURISDICTION

### A. Legal Standard

The claimants assert that this court lacks subject matter jurisdiction over the civil

forfeiture complaint because the government has failed to allege violations of federal statutes.[4]

Rule 12(b) of the Federal Rules of Civil Procedure and Rule G of the Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeiture Actions are applicable to this civil forfeiture

---

[3] The New Zealand High Court has original and appellate jurisdiction over criminal and civil matters; the Court of Appeal is New Zealand's intermediate appellate court, hearing appeals from the High Court and other lower courts; the Supreme Court is New Zealand's final court of appeal. *See Courts*, MINISTRY OF JUSTICE, http://www.justice.govt.nz/courts (last visited Feb. 12, 2015).

[4] The claimants argue that because they have challenged subject matter jurisdiction, the court must decide their motion to dismiss before deciding the fugitive disentitlement issue. The Court agrees that "subject matter jurisdiction, when questioned, [must] be decided before any other matter." *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir. 2012). However, subject matter jurisdiction may also be considered *sua sponte.* The court need not decide the claimants' motion to dismiss the complaint, which raises issues that go to the merits of the action, in order to resolve the jurisdictional questions. Disentitlement is a threshold issue that the court will resolve before reaching the merits of the case. *See United States v. $6,976,934.65 Plus Interest*, 486 F. Supp. 2d 37, 38 (D.D.C. 2007).

*in rem* action. Rule G(8)(b) authorizes a claimant to move to dismiss a forfeiture complaint pursuant to Rule 12(b). A motion made pursuant to Fed. R. Civ. P. 12(b)(1) challenges the court's jurisdiction over the subject matter of the case. Generally, the plaintiff bears the burden to establish and preserve jurisdiction. *See Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Subject matter jurisdiction over civil asset forfeiture actions is governed by 28 U.S.C. § 1345[5] and 28 U.S.C. § 1355(a). Section 1355(a) provides that "[t]he district courts shall have original jurisdiction...of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, *incurred under any Act of Congress*." 28 U.S.C. § 1355(a) (emphasis added); *United States v. Wilson*, 699 F.3d 789, 795 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 2401 (2013) (holding that a procedural deadline for filing a civil forfeiture complaint in the Civil Asset Forfeiture Reform Act of 2000 is non-jurisdictional).

In *United States v. $6,190 in U.S. Currency*, 581 F.3d 881 (9th Cir. 2009), the Ninth Circuit considered a challenge to subject matter jurisdiction in a civil forfeiture case:

> Jurisdiction over civil forfeiture actions brought under 28 U.S.C. § 1355 is not premised on a federal indictment, but rather *on a violation of an Act of Congress. See* 28 U.S.C. § 1355(a); *see also United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361-63, 104 S. Ct. 1099, 79 L. Ed. 2d 361 (1984) (holding that a claimant's assets were subject to forfeiture even though claimant was acquitted on federal criminal charges). *To bring a civil forfeiture proceeding under § 1355, the government is required only to show probable cause that the assets in question are traceable to a violation of an Act of Congress. See [United States v.] $493,850.00 in U.S. Currency*, 518 F.3d [1159], [] 1167–69 (holding that the Civil Asset Forfeiture Reform Act of 2000 did not alter the probable cause requirement).

*$6,190 in U.S. Currency*, 581 F.3d at 885 (emphasis added).

---

[5] 28 U.S.C. § 1345 provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States." 28 U.S.C. § 1345.

Courts within the Fourth Circuit have used a synonymous "reasonable belief" pleading requirement in examining motions to dismiss forfeiture complaints pursuant to Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to this rule tests the sufficiency of a complaint. *See, e.g., United States v. $15,860 in U.S. Currency*, 962 F. Supp. 2d 835, 838 (D. Md. 2013) ("For the government to meet the pleading requirements [of Fed. R. Civ. P. 12(b)(6)], it must state sufficient facts to support a reasonable belief based on the totality of the circumstances that the defendant property is linked to drug trafficking and, thus, subject to forfeiture") (citing *United States v. Mondragon*, 313 F.3d 862, 866-67 (4th Cir. 2002)). The *$15,860* court noted that its analysis would not change if it were to use the "probable cause" standard applied by the Ninth Circuit. *Id.* at 840 n.6.

## B. Subject Matter Jurisdiction is Satisfied

The forfeiture complaint alleges that the named assets are subject to forfeiture pursuant to 18 U.S.C. § 981 and 18 U.S.C. § 2323, because the assets are traceable to copyright infringement, conspiracy to commit copyright infringement, and money laundering offenses.[6] 18 U.S.C. § 981(a)(1)(A) provides for forfeiture of property traceable to violations of 18 U.S.C. §§ 1956 and 1957. Section 1956(a)(1) prohibits the use of the proceeds of an unlawful activity where a person knows the illegal nature of the proceeds and conducts or attempts to conduct a financial transaction with the intent to promote carrying out a "specified unlawful activity" or with the knowledge that the transaction is "designed in whole or in part" to conceal the "nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). Section 1956(a)(2) prohibits the transmission of such illegal

---

[6] The forfeiture complaint also incorporates by reference the allegations contained in the superseding indictment. *See* Complaint, ¶ 16.

funds into or out of the United States.  18 U.S.C. § 1957(a) prohibits engaging in a "monetary transaction in criminally derived property of a value greater than $10,000."  18 U.S.C. § 1957(a).

Section 1956(h) provides criminal liability for conspiracy to commit offenses described in §§ 1956 or 1957.  Section 981 subjects to forfeiture any property traceable to "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."  18 U.S.C. § 981(a)(1)(C).  Section 1956(c)(7)(D) lists a number of offenses that constitute "specified unlawful activity," including offenses relating to copyright infringement under 18 U.S.C. § 2319.  18 U.S.C. § 1956(c)(7)(D).

Section 2319 sets forth the penalties for a violation of 17 U.S.C. § 506(a)(1), which criminalizes infringement of a copyright (A) for commercial advantage or private financial gain; (B) by reproducing or distributing infringing copies of copyrighted works with a value of over $1,000 in any 180-day period; or (C) by distributing a work being prepared for commercial distribution if the person knew or should have known that the work was intended for commercial distribution.  17 U.S.C. § 506(a)(1).  Section 506(b) provides that forfeiture under the statute shall be governed by 18 U.S.C. § 2323.  17 U.S.C. § 506(b).  Section 2323(a)(1) subjects to forfeiture any property used or intended to be used to commit an offense under § 506 or any proceeds obtained "directly or indirectly" from an offense prohibited by § 506.  18 U.S.C. § 2323 (a)(1).

The claimants argue that the government has not properly alleged a violation of any federal statute to support jurisdiction under § 1355.  Specifically, they argue that the government has not adequately alleged criminal copyright infringement because the complaint only references acts of "secondary" infringement, rather than direct infringement.  This argument refers to the government's allegations concerning the Mega business model, which involved the

6

claimants' alleged encouragement and facilitation of infringement by others. *See, e.g.,* Complaint, ¶ 20. The claimants argue that they cannot possibly be held criminally liable for acts that contributed to or facilitated infringement. Even assuming, *arguendo,* that only acts of contributory infringement are alleged in the forfeiture complaint, this argument ignores the complaint's allegations that the claimants engaged in a conspiracy to commit copyright infringement. Section 981(a)(1)(C) authorizes civil forfeiture of property traceable to, among numerous other offenses, copyright infringement or conspiracy to commit copyright infringement.

In order to establish a conspiracy under 18 U.S.C. § 371, the government must show "(1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy." *United States v. Jackson,* No. 13-cr-129, 2013 WL 3197069, slip op. at *5 (E.D. Va. June 20, 2013) (citing *United States v. Ellis,* 121 F.3d 908, 922 (4th Cir. 1997). The forfeiture complaint has alleged that each of the individual claimants participated in a conspiracy to commit copyright infringement in the Eastern District of Virginia and elsewhere. Numerous alleged communications of the claimants have been presented, indicating that they had an agreement to engage in a business involving the Mega websites.

According to the complaint, every time an Internet user uploaded an infringing file to the Megaupload website, Mega reproduced the file on at least one computer server it controlled and provided the uploading user with a uniform resource locator ("URL") link allowing anyone with the link to download the file. *See* Complaint, ¶ 18. The conspirators also allegedly provided monetary payments to the top uploaders of infringing content in order to encourage Internet users to upload infringing files onto the Mega sites. *Id.* at ¶ 20. In furtherance of the conspiracy, the claimants allegedly developed software to identify the most popular files uploaded to their sites,

7

almost all of which were infringing, and to automatically reproduce those files to Mega's faster servers operated by Cogent Communications in Washington, D.C. *Id.* at ¶ 23. The government has alleged that the conspirators knew that these files were infringing copyrights, as evidenced by their exclusion of infringing files from the "Top 100" list. The "Top 100" list purported to list the most frequently downloaded files on Megaupload. *Id.* at ¶ 32. According to the government, an accurate list would have consisted almost entirely of infringing content, so the claimants "carefully curated" the list to make the site look more legitimate. *Id.* Additionally, the claimants regularly told copyright holders, including many U.S.-based organizations, that they would remove infringing content, when in actuality they only removed particular links to the files. *Id.* at 26-29. The actual infringing files remained on the Mega-controlled servers and could be accessed from other links. The indictment alleges that some of the communications to copyright holders were sent from computer servers located in the Eastern District of Virginia. *See* Superseding Indictment, ¶ 73.

Thus, the factual allegations in the complaint and the superseding indictment show that there was an agreement among the claimants to engage in the alleged Mega Conspiracy, and at least some overt acts in furtherance of the conspiracy occurred within this judicial district. The complaint states that the assets in question are largely traceable to funds received by a PayPal, Inc. account that was used by the Mega Conspiracy to receive subscription payments from users who viewed the infringing videos on the Mega websites. *See* Complaint, ¶¶ 40-45. This court is therefore satisfied that there are sufficient factual allegations to support either probable cause or a reasonable belief that the assets listed in Attachment A are traceable to a conspiracy to commit

copyright infringement. Accordingly, this court has subject matter jurisdiction over the civil forfeiture complaint.[7]

## III. IN REM JURISDICTION

### A. Legal Standard

The claimants argue that *in rem* jurisdiction is lacking because the property is located in foreign countries. As the government notes, 28 U.S.C. § 1355(b)(2) provides that "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought" in the district where any of the acts or omissions giving rise to the forfeiture occurred. 28 U.S.C. § 1355(b)(2).

Several federal appellate courts have held that § 1355(b)(2) provides for in rem jurisdiction over property subject to forfeiture that is located in another country. *See United States v. Approximately 1.67 Million in Cash*, 513 F.3d 991, 998 (9th Cir. 2008) ("The plain language and legislative history of the 1992 amendments makes clear that Congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res"); *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 403-405 (3d Cir. 2003) (holding that the district court had jurisdiction "solely based on § 1355(b)(2)" to order the forfeiture of assets located in the United Arab Emirates); *United States v. All Funds in Account Nos. 747.034/278, 747.009/278, & 747.714/278*, 295 F.3d 23, 27 (D.C. Cir. 2002) ("Congress intended the District Court for the District of Columbia, among others, to have

---

[7] Having found that there is subject matter jurisdiction over the forfeiture complaint, the court declines to consider additional arguments by the claimants relating to the extraterritorial application of the criminal copyright statute, 17 U.S.C. § 506. The court also declines to examine whether forfeiture is supported by every charge listed in the superseding indictment. It is unnecessary to resolve those questions in order to determine that the court has subject matter jurisdiction over the forfeiture complaint.

jurisdiction to order the forfeiture of property located in foreign countries," unless the

"Constitution commands otherwise"). The reasoning of these circuits is persuasive.[8]

## B. The Jurisdictional Requirements of § 1355(b) are Satisfied

All of the property listed in Attachment A is located either in Hong Kong or New

Zealand. The assets have been restrained pursuant to the legal processes of those countries at the

request of the United States government. This forfeiture action thus concerns property located in

foreign countries and detained pursuant to the legal processes of those countries. The forfeiture

complaint and superseding indictment contain allegations that the conspiracy utilized over 525

servers located within the Eastern District of Virginia,[9] and received payments from within this

district and elsewhere to a PayPal account. *See* Superseding Indictment, ¶¶ 39, 42. The

claimants allegedly reproduced and stored infringing files on these servers and caused

communications to be sent from servers in Virginia indicating that infringing files had been

removed. *See* Superseding Indictment, ¶ 73. Therefore, the court finds that alleged acts in

furtherance of the conspiracy to commit copyright infringement occurred within this judicial

district. The alleged acts in furtherance of the conspiracy constitute acts giving rise to the

forfeiture claim. Accordingly, there are minimum contacts between this jurisdiction and the

defendant assets,[10] and this court has *in rem* jurisdiction over the assets listed in Attachment A

pursuant to § 1355(b).

---

[8] The Second Circuit had taken a different approach and applied the traditional rules of admiralty to forfeiture actions, requiring that there be constructive or actual control over the *res* in order for the district court to exercise *in rem* jurisdiction. *See United States v. All Funds on Deposit...in Names of Meza or de Castro*, 63 F.3d 148, 152-153 (2d Cir. 1995). But a year later, that court held that the amendments to § 1355 "provide district courts with *in rem* jurisdiction over a *res* located in a foreign country." *United States v. Certain Funds Contained in Account Numbers...Located at the Hong Kong and Shanghai Banking Corp.*, 96 F.3d 20, 22 (2d Cir. 1996).

[9] The servers were operated by Carpathia Hosting and located in Ashburn, Virginia, which is within the Eastern District of Virginia. *See* Superseding Indictment, ¶ 39.

[10] The claimants argue that there are insufficient minimum contacts between the assets and this forum. Ordinarily, the Due Process Clause requires that there be sufficient minimum contacts between a defendant (here, the assets) and the forum in order for a federal court to exercise jurisdiction. *See Harrods Ltd. v. Sixty Internet Domain Names,*

## IV. THE FUGITIVE DISENTITLEMENT DOCTRINE

### A. Statutory Prerequisites of § 2466

The fugitive disentitlement doctrine developed under the common law as a method to dismiss direct appeals from criminal defendants who were fugitives at the time of their appeal. *See, e.g., United States v. Al-Kurdi*, 332 F. App'x 151, 152 (4th Cir. 2009) (invoking common law fugitive disentitlement doctrine to dismiss appeal of criminal defendant who was a fugitive during the pendency of his appeal). *See also Collazos v. United States*, 368 F.3d 190, 197 (2d. Cir. 2004) (discussing cases invoking the common law fugitive disentitlement doctrine). In *Degen v. United States*, 517 U.S. 820 (1996), the Supreme Court declined to extend the common law doctrine to allow courts to disentitle fugitive claimants in civil forfeiture actions.

In 2000, Congress comprehensively overhauled the civil asset forfeiture laws and specifically granted federal courts the authority to order disentitlement in civil forfeiture cases in the Civil Asset Forfeiture Reform Act ("CAFRA"). *See* 28 U.S.C. § 2466. That statute was designed to prevent the unseemly "spectacle" recognized in *Degen* of a "criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction." *United States v. Technodyne,* 753 F.3d 368, 377 (2d Cir. 2014) (quoting *Collazos*, 368 F.3d at 200).

---

302 F.3d 214, 224 (4th Cir. 2002) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, (1945)). Section 1355(b)(2) only allows a forfeiture action concerning property located in a foreign country to be brought in a district court where any of the acts giving rise to the forfeiture occurred. Thus, § 1355's requirement that some act giving rise to the forfeiture must occur within the judicial district exercising jurisdiction serves much the same function as the minimum contacts test. The claimants also argue that the court should require a heightened level of contacts because the suit involves foreign corporations. *See* Opp. at 8. However, none of the corporations are *defendants* in this civil *in rem* action. Rather, the court is exercising *in rem* jurisdiction over the assets listed in Attachment A.

Section 2466 provides:

(a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person—

(1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution—

(A) purposely leaves the jurisdiction of the United States;

(B) declines to enter or reenter the United States to submit to its jurisdiction; or

(C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and

(2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.

(b) Subsection (a) may be applied to a claim filed by a corporation if any majority shareholder, or individual filing the claim on behalf of the corporation is a person to whom subsection (a) applies.

At common law, courts generally did not consider as "fugitives" persons who had never previously entered the United States. *See Collazos*, 368 F.3d at 198-201. Subpart A obviously applies to traditional common law fugitives, persons who allegedly committed crimes while in the United States and who, upon learning that their arrest was sought, purposely fled the country. § 2466(a)(1)(A). Similarly, the "reenter" provision of subpart B extends disentitlement authority over another class of persons traditionally recognized as fugitives, persons who allegedly committed crimes while in the United States, but who were outside the country when they learned that their arrests were sought and who then refused to return to the United States in order to avoid prosecution. § 2466(a)(1)(B). However, subpart B also applies to persons who decline to "enter" the United States. *Id.* The plain meaning of this language is that a person who has never

12

entered the United States but who declines to enter in order to avoid criminal prosecution may be a fugitive pursuant to § 2466. *See Collazos*, 368 F.3d at 198-201; *United States v. $6,100,000 on Deposit*, No. 07-cv-4430, 2009 WL 1809992, *4 (S.D.N.Y. 2009) (disentitling a claimant who had never been to the United States pursuant to § 2466).

Further, subpart C applies to persons who "otherwise evade[]" the jurisdiction of a United States court in which a criminal case is pending against them. 28 U.S.C. § 2466(a)(1)(C). "Evasion is an expansive concept" not limited to the deliberate flight referenced in § 2466(a)(1)(A) or the refusal to enter or reenter identified in § 2466(a)(1)(B). *Collazos*, 368 F.3d at 200 (internal quotation marks omitted). "Nothing in subpart (C) indicates that a person must have been within the jurisdiction of the court at the time the crime was committed in order thereafter to evade jurisdiction." *Id.*

Claimants argue that the government cannot raise the fugitive disentitlement doctrine on a motion to strike. Numerous courts, however, have granted motions to strike the claims of a person determined to be a fugitive.[11] The Court is persuaded by their reasoning and finds that fugitive disentitlement can be ordered where the government has moved to strike the claim of an alleged fugitive. *See United States v. $6,976,934.65 Plus Interest*, 478 F. Supp. 2d 30, 38

---

[11] *See, e.g., United States v. Assorted Money Orders Totaling $138,400*, No. 07-13330, 2010 WL 1438901, *2 (E.D. Mich. Apr. 9, 2010) (granting government's motion to strike claim pursuant to fugitive disentitlement doctrine); *United States v. Vehicle 1995 Great Dane*, No. 98-40285, 2010 WL 1417841, *2 (E.D. Mich. Apr. 5, 2010) (granting government's motion to strike claim pursuant to fugitive disentitlement doctrine); *United States v. $1,474,770 in U.S. Currency*, 538 F. Supp. 2d 1298, 1302 (S.D. Cal. 2008) (granting government's motion to strike claim pursuant to fugitive disentitlement doctrine); *United States v. $1,278,795*, No. Civ-L-03-87, 2006 WL 870364, *2 (S.D. Tex. Mar. 30, 2006) (treating motion to strike claim pursuant to fugitive disentitlement doctrine as motion to dismiss and dismissing the fugitive's claim, as well as granting summary judgment on the merits); *United States v. One 1988 Chevrolet Cheyenne Half-Ton Pickup Truck*, 357 F. Supp. 2d 1321, 1333 (S.D. Ala. 2005) (granting government's motion to strike claim pursuant to fugitive disentitlement doctrine); *United States v. $1,231,349.68 in Funds*, 227 F. Supp. 2d 130, 133 (D.D.C. 2002) (granting government's motion to strike claim pursuant to fugitive disentitlement doctrine).

(D.D.C. 2007) (holding that a motion pursuant to § 2466 is "properly treated as one to dismiss the claim, on which the Court may consider matters outside the pleadings").[12]

## B. Intent

The Fourth Circuit has not yet considered fugitive disentitlement pursuant to § 2466. Circuits that have weighed in have held that the statute's plain language identifies five prerequisites that must be met before a court may exercise its discretion to disentitle a claimant:

> (1) a warrant or similar process must have been issued in a criminal case for the claimant's apprehension; (2) the claimant must have had notice or knowledge of the warrant; (3) the criminal case must be related to the forfeiture action; (4) the claimant must not be confined or otherwise held in custody in another jurisdiction; and (5) the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States, (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant.

*Collazos*, 368 F.3d at 198. *See also Technodyne*, 753 F.3d at 378 (2d Cir. 2014); *United States v. $671,160 in U.S. Currency*, 730 F.3d 1051, 1055-1056 (9th Cir. 2013); *United States v. $6,976,934.65, Plus Interest*, 554 F.3d 123, 128 (D.C. Cir. 2009); *United States v. $6,190 in U.S. Currency*, 581 F.3d 881, 886 (9th Cir. 2009); *United States v. Salti*, 579 F.3d 656, 663 (6th Cir. 2009).

The parties primarily dispute the intent element, so the court will focus on that element first. Section 2466 does not specify the requisite showing of intent necessary to satisfy the fifth element of the test identified by the circuit courts. The statute provides that the alleged fugitive must have acted "in order to avoid criminal prosecution." § 2466(a)(1). Some courts have held that "[m]ere notice or knowledge of an outstanding warrant, coupled with a refusal to enter the United States, does not satisfy the statute." *United States v. Bohn*, No. 02-20165, 2011 WL 4708799, *9 (W.D. Tenn. June 27, 2011)

---

[12] The claimants argue that discovery is required on two issues, the possibility of government overreach and the issue of the claimants' intent. The court disagrees. The allegations of government overreach are insufficient to warrant discovery. The court also finds that it is able to make a decision regarding the claimants' intent based on the record before it. Moreover, it is unclear how discovery could help the claimants present evidence of their own intent. *See United States v. $671,160 in U.S. Currency*, 730 F.3d 1051, 1059 (9th Cir. 2013) ("[Claimant's] reasons for remaining in Canada lie exclusively in [his] mind and cannot be uncovered by requesting information from third parties").

14

(finding insufficient evidence of intent where claimant was in Vanuatu long before he was charged and no other evidence showed that he remained there in order to avoid prosecution in the United States) (quoting *United States v. $6,976,934.65, Plus Interest*, 554 F.3d at 132);[13] *see also United States v. Salti*, 579 F.3d at 664. Other courts have emphasized that the intent of the alleged fugitive may be analyzed under the "totality of the circumstances." *Technodyne*, 753 F.3d at 378; *Collazos*, 368 F.3d at 201(finding that the totality of the circumstances indicated that the claimant made a conscious choice not to "enter or reenter the United States" to face criminal prosecution).

At least two circuits have explicitly held that a desire to avoid prosecution need not be the sole reason for the claimant's refusal to enter the United States. *See Technodyne*, 753 F.3d at 383-384 (2d Cir. 2014) (finding that the government was required to prove that the claimants remained outside of the United States with the "specific intent to avoid criminal prosecution," but refusing to "equate specific intent with sole, principal, or dominant intent"); *$671,160 in U.S. Currency*, 730 F.3d at 1056 n.2 (9th Cir. 2013) ("[Claimant's] desire to evade criminal prosecution need not be the sole motivating factor causing him to remain abroad, to the exclusion of all others"). Accordingly, the court finds that while the government must show that the claimants possess a specific intent to avoid criminal prosecution, that intent need not be the sole reason the claimants declined to enter the United States.

None of the claimants dispute that they are aware of their indictments in this district. It is also beyond dispute that the criminal case is related to the forfeiture action.

---

[13] The claimants argue that the D.C. Circuit's holding in *$6,976,934.65* requires the government to show that intent to avoid prosecution is the sole motivating factor behind a claimant's decision to remain outside of the United States. *See $6,976,934.65*, 554 F.3d at 132 (D.C. Cir. 2009) (finding that avoiding prosecution must be "*the* reason" the claimant refused to enter the United States) (emphasis in original). This court is persuaded by the decision of the Second Circuit in *Technodyne*, which rejected such an interpretation of the D.C. Circuit's opinion. *Technodyne*, 753 F.3d at 384.

The assets sought in the civil forfeiture action are alleged to be proceeds of and property traceable to offenses charged in the superseding indictment. Further, the assets are subject to restraining orders issued by this court and registered in foreign courts in connection with the criminal action. None of the claimants are confined or otherwise held in custody in another jurisdiction. The claimants in this action dispute only the intent element. In short, they argue that the evidence before the court does not establish that they deliberately sought to avoid prosecution. For the reasons discussed below, the court finds that each claimant has deliberately declined to enter the United States in order to avoid criminal prosecution in this country.

### *Kim Dotcom*[14]

Dotcom is a dual citizen of Germany and Finland, and he has never lived in or visited the United States. He is currently residing in New Zealand. Dotcom stated in his declaration that he learned of the indictment on January 20, 2012, when he was arrested in New Zealand pursuant to a request by United States authorities. *See* Decl. of Kim Dotcom, ¶ 3. The evidence before this court indicates that he has been released on bail since February, 2012. *See* Reserved Judgment of J. Dawson (granting bail to Dotcom). Dotcom has stated that he is not permitted to leave New Zealand, but it is apparent that he is only being held pursuant to the United States government's request for his extradition. *See* Dotcom's Response to Special Interrogatory No. 7. He cannot dispute that he is free at any time to submit to U.S. jurisdiction. *See 479 Tamarind Drive*, No. 98-cv-2279, 2005 WL 2649001 at *3 (S.D.N.Y. Oct. 14, 2005) (disentitling claimant who argued that he was bound by conditions of bond not to leave Canada where the evidence showed that

---

[14] Kim Dotcom has been known by other names, including "Kim Schmitz" and "Kim Tim Jim Vestor." *See* Complaint, ¶ 7.

he was arrested in Canada pursuant to an extradition request); *$1,231,349.68 in Funds*,

227 F. Supp. 2d at 130, 133 (D.D.C. 2002) (finding that claimant's arrest in Spain

pursuant to extradition request was not custody or confinement for purposes of §

2466(a)(2)).

The record presents significant evidence that Dotcom has declined to enter the United

States in order to avoid criminal prosecution.  Dotcom stated that since his arrest, he has been

"actively contesting the legal basis on which the United States has issued the indictment and

[has] sought to enforce" his rights.  *See* Decl. of Kim Dotcom, ¶ 5.  On July 10, 2012, Dotcom

sent a public message from his Twitter account stating, "Hey DOJ, we will go to the U.S.  No

need for extradition.  We want bail, funds unfrozen for lawyers & living expenses." *See* Govt.

Ex. B to Attach. 1.  An article dated July 11, 2012 stated that Dotcom "said he would willingly

go to the US [sic] if he and his co-defendants were given a guarantee of a fair trial, money to pay

for a defence [sic] and funds to support themselves and their families." *See* Govt. Ex. E to

Attach. 1.  In the article, Dotcom is quoted as saying that the government would not agree

"because they can't win this case and they know that already." *Id.* (internal quotation marks

omitted).

On June 5, 2014, Dotcom posted a Twitter message offering five million U.S. dollars to

anyone with "anything to leak about the Megaupload case" that could result in his victory. *See*

Govt. Ex. B to Attach. 1.  Three days later, he posted a link to an article about his offer.  Articles

about Dotcom's offer reported that he was looking for information regarding unlawful or corrupt

conduct by the United States government, the New Zealand government, spy agencies, law

enforcement, and the motion picture industry in connection to his case. *See* Govt. Exhibits C, D

to Attach. 1.

Dotcom has not disputed that he has sought favorable conditions in connection with submitting to the jurisdiction of the United States. Indeed, in his response to the government's special interrogatories, Dotcom stated that his attorneys conveyed to the government that he would be willing to voluntarily come to the United States to stand trial, provided that the government agreed that he would be free on bail and have a portion of his seized assets released to fund living expenses and defense attorneys. *See* Dotcom's Response to Special Interrogatory No. 6. He indicated that it was his understanding that the government had rejected his offer. Thus, he has corroborated the evidence presented by the government.

Dotcom's response to the government's argument that he is deliberately avoiding prosecution is that he has never been to the United States. He asserts that he remains in New Zealand because that has been his place of residence since before he learned of the indictment, his family owns a home in that country and rents a neighboring home, and he intends to continue to live and work there. *See* Decl. of Kim Dotcom, ¶ 10. His work in New Zealand includes Internet entrepreneurship and founding a political party.

As demonstrated, Dotcom need not have previously visited the United States in order to meet the prerequisites of § 2466. The statute is satisfied where the government shows that the claimant is on notice of the criminal charges against him and refuses to "enter or reenter" the country with the intent to avoid criminal prosecution. Because the court assesses intent under the totality of the circumstances, it is certainly relevant that Dotcom has never been to the United States and that he has lived in New Zealand since 2011, where he resides with his family. This tends to show that he has other reasons for remaining in New Zealand besides avoiding criminal prosecution. However, the existence of other motivations does not preclude a finding that he also has a specific intent to avoid criminal prosecution. Dotcom's statements, made publicly and

18

conveyed by his attorneys to the government, indicate that he is only willing to face prosecution in this country on his own terms. *See Technodyne*, 753 F.3d at 386 (2d Cir. 2014) ("The district court was easily entitled to view those [requests for bail], evincing the [claimants'] desire to face prosecution only on their own terms, as a hallmark indicator that at least one reason the [claimants] declined to return in the absence of an opportunity for bail was to avoid prosecution"). Dotcom has indicated through his statements that he wishes to defend against the government's criminal charges and litigate his rights in the forfeiture action. If it is truly his intent to do so, then he may submit to the jurisdiction of the United States. *See 1,231,349.68 in Funds*, 227 F. Supp. 2d at 133 (stating that if the claimant truly intended to fight the charges as he stated, then he had a clear option to return to the United States).

### The Corporate Claimants

Subsection b of § 2466 provides that a corporate claimant may be disentitled "if any majority shareholder, or individual filing the claim on behalf of the corporation is a person" for whom the statutory prerequisites are met. 28 U.S.C. § 2466(b). Kim Dotcom is the individual who filed the claims on behalf of Megaupload Limited, Megamedia Limited, Megapay Limited, Megastuff Limited, and Vestor Limited. *See* Verified Claim of Kim Dotcom on Behalf of the Corporate Claimants. There is also evidence that Dotcom is a majority shareholder of the corporate claimants. Because the statutory prerequisites have been satisfied with respect to Dotcom, the corporate claimants are also subject to disentitlement pursuant to § 2466(b).

### Finn Batato and Mathias Ortmann

Finn Batato and Mathias Ortmann stated in their declarations that they learned of the indictments against them when they were arrested on January 20, 2012 at Kim Dotcom's home. *See* Decl. of Finn Batato at ¶ 3; Decl. of Mathias Ortmann, ¶ 3. Batato and Ortmann remain in

19

New Zealand subject to conditions of bail related to ongoing extradition proceedings. Both Batato and Ortmann are citizens of Germany. Neither has been a permanent resident of the United States. Batato stated in his declaration that since learning of the indictment, he has "been actively contesting the legal basis on which the United States has issued the indictment and [has] sought to enforce [his] legal rights." *See* Decl. of Finn Batato, ¶ 5. Ortmann made the same statement in his declaration. *See* Decl. of Mathias Ortmann, ¶ 5. Batato and Ortmann have each indicated that they plan to continue to live and work in New Zealand, where they are opposing extradition.[15] Their statements indicate that they wish to avoid prosecution in the United States by remaining in New Zealand. Batato and Ortmann are thus attempting to avoid criminal prosecution in the United States, while at the same time asserting their rights to litigate the criminal and civil forfeiture actions. It is apparent from the totality of the circumstances that Batato and Ortmann are refusing to enter the United States in order to avoid criminal prosecution.

### *Bram van der Kolk*

Bram van der Kolk stated in his declaration that he became aware of the indictment when he was arrested at his home on January 20, 2012.[16] *See* Decl. of Bram van der Kolk, ¶ 3. Since learning of the indictment, he has "been actively contesting the legal basis on which the United States has issued the indictment and [has] sought to enforce [his] legal rights." *Id.* at ¶ 5. He is a citizen of the Netherlands, and he stated that he has never resided in the United States. He has previously visited the United States for about five days in October 2009. *Id.* at ¶ 8. Van der Kolk is obviously opposing extradition, and he has admitted that he intends to remain in New

---

[15] Claimants argue that opposition to extradition is relevant only to the issue of whether a claimant is on notice of the criminal charges. The court disagrees, as intent is analyzed under the totality of the circumstances.

[16] Dotcom, Batato, and Ortmann were arrested at Dotcom's residence. Van der Kolk was arrested separately in New Zealand.

Zealand while he contests the government's criminal action and civil actions. Like Batato and Ortmann, he is thus avoiding criminal prosecution in the United States while attempting to litigate the civil forfeiture action. It is apparent from the totality of the circumstances that van der Kolk is refusing to enter the United States in order to avoid criminal prosecution.

*Sven Echternach*

Sven Echternach is a citizen and resident of Germany. He has remained in Germany since late January 2012. Echternach has never been a permanent resident of the United States. On or about January 22, 2012, German authorities notified the United States government that Echternach had arrived in Germany from Manila, Philippines via the Frankfurt airport. *See* Declaration of FBI Special Agent Rodney J. Hays, ¶ 28. The United States government submitted a request to interview Echternach in Germany about his involvement in activities relating to the Megaupload business.[17] Echternach indicated that he would exercise his right not to give evidence if summoned for an interview.

On March 16, 2012, Echternach stated in a conversation with a third party that he hoped to talk to a lawyer soon in order to understand his defense strategy. *Id.* at ¶ 29. On May 17, 2013, Echternach stated that he was still not traveling, but he hoped that he would be able to travel again in a few months. According to the government, he has expressed hope in other conversations that the charges in the United States would be dismissed pursuant to motions of his counsel. *Id.*

Echternach has also stated that his counsel in Germany advised him that he must remain in that country to participate in the investigations occurring there. *See* Decl. of Echternach, ¶ 6. His Germany-licensed attorney, Klaus G. Walter, submitted an affidavit stating that he believed it was "more than likely that, should Mr. Echternach travel to the United States at the moment,

---

[17] Germany generally does not extradite its citizens to the United States.

he would be arrested and not be allowed to leave the United States and return to Germany in a timely manner." *See* Decl. of Klaus G. Walter, ¶ 5. Walter stated that Echternach is under investigation for three different proceedings, two of which result directly from requests of United States authorities and one of which results "indirectly" from the U.S. investigations. *Id.* at ¶ 3-4. However, Echternach's own declaration stated only that he is "subject to criminal investigations in Germany based on the same allegations that have been made by the United States government in the criminal case and this civil forfeiture case." *See* Decl. of Sven Echternach, ¶ 6. He stated further that he has been advised not to travel to the United States so that he will be available to participate in the "proceedings in Germany that were instituted at the request of the United States government." *Id.* Walter opined that if Echternach were unavailable to participate in the German investigative proceedings, his absence could lead to "additional disadvantages" and could "even result in a German arrest warrant." *See* Decl. of Klaus G. Walter, ¶ 8. Alternatively, Echternach could apparently face a default judgment in the German proceedings.

These allegations fall short of supporting an argument that Echternach is in custody or confinement in Germany. In *United States v. All Funds on Deposit at...Account No. 600-00338*, 617 F. Supp. 2d 103, 124-125 (E.D.N.Y. 2007), the court held that the claimant was not in custody such that he could not return to the United States to face the criminal charges against him, where he was free on bond in Namibia pending resolution of an extradition proceeding. Similarly, in *$1,231,349.68 in Funds*, 227 F. Supp. 2d at 133 (D.D.C. 2002), the court held that the claimant's arrest in Spain did not constitute custody where he was arrested for conduct that related "specifically to the alleged criminal conduct for which he was indicted" in the United States. *See also Collazos*, 368 F.3d at 201 (holding that "nothing in the record indicate[d] that Ms. Collazos was ever confined, incarcerated, or otherwise unable to travel to the United States

22

of her own volition in the months before the district court ordered disentitlement"). Although Echternach is not subject to extradition, the investigations occurring in Germany are evidently related to requests made by the United States government. Echternach is not incarcerated in Germany or subject to any court-ordered travel restrictions, nor is there any evidence other than Walter's opinion that he may not leave the country.

Echternach has emphasized that by remaining in Germany, he is choosing to live in his home country. That the claimant returned to his country of citizenship from the Philippines does not preclude a finding of disentitlement. *See United States v. $671,160 in U.S. Currency,* 730 F.3d 1051, 1056 (9th Cir. 2013) (affirming disentitlement of a claimant who returned to his home country). Echternach's reliance on his lawyer's advice evinces his intent to avoid prosecution in this country. Walter has all but admitted that his advice is predicated on his desire, as a criminal defense attorney, to keep his client from traveling to a country where he will be arrested. Echternach and Walter have thus conceded that at least one of Echternach's reasons for refusing to enter the United States is a desire to avoid criminal prosecution here in favor of participating in the investigations occurring in Germany. Echternach's statements in 2013 regarding his hope that he would be able to travel again in a few months further support the conclusion that he has remained in Germany in order to avoid extradition to the United States. Under these circumstances, the court finds that Echternach is declining to enter the United States in order avoid criminal prosecution.

### *Julius Bencko*

Julius Bencko is a citizen and resident of Slovakia.[18] He has never been a citizen or permanent resident of the United States. In his declaration, Bencko stated that after learning of his indictment while traveling in Portugal, he "returned to the Slovak Republic, where [he has]

---

[18] Slovakia generally does not extradite its citizens to the United States.

remained." *See* Decl. of Julius Bencko, ¶ 4.  In January of 2012, Bencko was traveling through Spain and/or Portugal with a Portuguese national identified in the record as J.G.  J.G. told Portuguese authorities that he drove Bencko across Europe and dropped him off at a train station in Bratislava, Slovakia.  *See* Declaration of FBI Special Agent Rodney J. Hays, ¶ 20.  J.G. stated that Bencko's intent was to take the train from Bratislava to the Slovakian town where he was born.  *Id.*

There is no evidence that Bencko was subject to custody or confinement in Slovakia or otherwise unable to leave that country.  In a March 2, 2012 conversation, Bencko told a third party that he was "stuck here in this post commie state...the sooner the USA will do some steps the soner [sic] they will let me go."  *Id.* at ¶ 23.  The most likely meaning to be inferred from his statement that he was "stuck" in Slovakia is that he was unable to travel without risking extradition to the United States.

On or about March 28, 2012, he told a third party that he would be able to come to Bratislava if needed, but that he would rather not travel.  *Id.* at ¶ 25.  In the same conversation, he indicated that he was facing a 55-year sentence in America.  On or about April 5, 2012, Bencko told a third party that he could get his brother and another individual to pick the third party up from Vienna, but he "cannot (better not) cross the border" himself.  *Id.* at ¶ 26.  The third party responded that he or she did not want Bencko to "cross border and risk [sic]," and Bencko replied that he would not.  *Id.*  Viewing the totality of the circumstances, it appears that Bencko is deliberately refusing to travel outside of Slovakia in order to avoid the risk of extradition to the United States.  He is thus declining to enter the United States in order to avoid criminal prosecution, while simultaneously attempting to assert a civil claim in the forfeiture action.

24

## V. DISCRETIONARY ANALYSIS

Although the statutory prerequisites of 28 U.S.C. § 2466 have been met for each of the

claimants, the court should also consider whether there are reasons not to exercise its discretion

to disentitle a fugitive.[19]  Section 2466 does not enumerate any factors for courts to consider in

analyzing whether to exercise their discretion.  Courts that have engaged in a discretionary

analysis have generally found that disentitlement should be applied.  *See, e.g., United States v.*

*$6,100,000 on Deposit*, No. 07-cv-4430, 2009 WL 1809992, *5 (S.D.N.Y. June 24, 2009)

(finding that appellate proceedings of claimant's co-defendant and the fact that the claimant's ex-

wife had also filed a claim to the restrained assets did not weigh against application of fugitive

disentitlement); *United States v. $1,474,770 in U.S. Currency*, 538 F. Supp. 2d 1298, 1302 (S.D.

Cal. 2008); *United States v. All Funds on Deposit at...Account No. 600-00338*, 617 F. Supp. 2d

103, 125-128 (E.D.N.Y. 2007); *United States v. One 1988 Chevrolet Cheyenne Half-Ton Pickup*

*Truck*, 357 F. Supp. 2d 1321, 1328-1333 (S.D. Ala. 2005).

The instant case presents facts of first impression.  The government seeks the

disentitlement of five corporate claimants and six individuals.  Further, all of the assets identified

in the forfeiture complaint are located in New Zealand and Hong Kong.[20]  The government has

argued that it will suffer significant prejudice if the claimants are not disentitled, due to

dissipation of the assets occurring in these countries.  In New Zealand, Dotcom and van der Kolk

have been able to successfully apply for release of funds from the restrained assets for living

expenses and attorneys fees.  The government represents that millions of dollars have been

dissipated in Hong Kong and New Zealand pursuant to court orders in both countries.  The court

---

[19] Section 2466 provides that a "judicial officer *may* disallow a person from using the resources of the courts of the United States." 28 U.S.C. § 2466 (emphasis added).
[20] The government indicated during oral argument that there are assets located in other countries as well, but those assets are not the subject of this litigation.

understands the government's concern, however, the assets at issue are located within the

jurisdiction and control of courts in New Zealand and Hong Kong, and release of the assets has

occurred pursuant to the legal processes of those nations.

***Treaties***

The claimants argue that application of § 2466 would violate the Supremacy Clause of

the United States Constitution, due to the existence of treaties that were enacted after § 2466.[21]

The two treaties they point to are the United Nations Convention Against Transnational

Organized Crime ("UNCTOC"), a multi-nation treaty to which the United States and New

Zealand are parties; and the Mutual Legal Assistance Treaty ("MLAT") between the United

States and Germany.

UNCTOC Article 16, ¶ 13 provides that:

> Any person regarding whom [extradition] proceedings are being carried out in
> connection with any of the offences to which this article applies shall be
> guaranteed fair treatment at all stages of the proceedings, including enjoyment of
> all the rights and guarantees provided by the domestic law of the State Party in the
> territory of which that person is present.

United Nations Convention Against Transnational Organized Crime, art. 16, ¶ 13, Dec.
12, 2000, 2255 U.N.T.S. 209.

According to the claimants, this provision means that the claimants currently residing in New

Zealand (Dotcom, Batato, Ortmann, and van der Kolk) are entitled to take advantage of New

Zealand laws that guarantee a domestic right to challenge property seizures. As support for this

---

[21] The claimants also raise a number of other constitutional arguments, asserting that disentitlement would violate their Seventh Amendment right to jury trial, the Eighth Amendment ban on excessive fines, and the Due Process Clause. The court rejects all of these arguments. The claimants are welcome to exercise the right to a trial in the civil forfeiture action, but they must submit to United States jurisdiction in order to do so. The court similarly rejects the argument that disentitlement and a subsequent order of forfeiture would violate the Eighth Amendment. *See United States v. All Funds on Deposit at...Account No. 600-00338*, 617 F. Supp. 2d at 130 (E.D.N.Y. 2007) (holding that fugitive claimant "waived his rights to press his Excessive Fines claim" "by failing to appear to face the criminal charges against him"). Finally, due process is not violated by imposition of the fugitive disentitlement doctrine. *See Collazos*, 368 F.3d at 205 ("In sum, because statutory disentitlement is itself preceded by notice and hearing [sic], and because such disentitlement does not impose a punishment but rather creates an adverse presumption that a claimant can defeat by entering an appearance in a related criminal case, we hold that 28 U.S.C. § 2466 does not violate due process by depriving a forfeiture claimant of property without a hearing").

domestic property right, the claimants point to a law review article discussing litigation in the New Zealand courts regarding the legality of the search of Dotcom's home and the disclosure of evidence in the extradition proceedings.

The claimants may be entitled to litigate in New Zealand while they remain in that country, but nothing in this provision states that disentitlement cannot be ordered separately against a claimant who evades the jurisdiction of the United States. That the exercise of their rights in New Zealand may cause disadvantages for the claimants with respect to litigation occurring in America does not mean that they are being treated unfairly or that they are denied their enjoyment of rights in New Zealand. The court cannot conclude on the record before it that application of § 2466 would be unconstitutional. The court does not find a conflict between the statute and the treaty, and the Supremacy Clause is therefore not offended. *See Whitney v. Robertson*, 124 U.S. 190, 194 (1888) (stating that when a treaty and a statute "relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either").

Echternach argues that the Mutual Legal Assistance Treaty ("MLAT") between the United States and Germany trumps the disentitlement statute and therefore he cannot constitutionally be disentitled. Specifically, he references Article 4, ¶ 4 of the MLAT, which provides that:

> A person who is not a national or resident of the [country requesting extradition] and who does not answer a summons to appear in the [country requesting extradition] served pursuant to a request shall not by reason thereof be liable to any penalty or be subjected to any coercive measures.

Mutual Legal Assistance Treaty, art. 4, ¶ 4, U.S.-Ger., Oct. 13, 2003, T.I.A.S. 09-1018.

The court entertains serious doubts that this treaty bars application of the fugitive disentitlement statute against all individuals who are not nationals or residents of the United States and who

maintain fugitive status in Germany. Moreover, fugitive disentitlement is not necessarily a penalty or coercive measure. In analyzing whether § 2466 violates due process, the *Collazos* court found that disentitlement pursuant to § 2466 is not a punitive deprivation of the right to be heard. Instead, the statute:

> establishes a presumption that a person who refuses to produce himself in connection with criminal charges relating to the civil forfeiture has no meritorious defense against the latter action. Because a person can defeat that presumption by appearing in the criminal case, a deliberate choice not to do so constitutes a knowing waiver of the hearing otherwise available by law.

*Collazos v. United States*, 368 F.3d at 205-206.

Following the reasoning of *Collazos*, the court finds that disentitlement is not a penalty or coercive measure such that it would conflict with the MLAT in the event the treaty is applicable to the present action.

### *Judicial Oversight of the Assets*

The claimants urge the court to consider in its discretionary analysis the fact that New Zealand courts continue to litigate important issues related to forfeiture of the assets. The court certainly considers as relevant the significant oversight by the New Zealand courts over the assets located in that country. Although the restraining order related to the criminal charges will expire in April, the parties indicated during oral argument that there are multiple civil actions being litigated in New Zealand against the claimants by various members of the motion picture industry. It is the court's understanding that the New Zealand assets restrained in connection with the criminal action will remain under restraints pursuant to orders issued in those civil actions. It appears therefore that the assets held in New Zealand are subject to significant oversight by the New Zealand courts due to the civil litigation occurring there.

This court accords great respect to courts in New Zealand and Hong Kong and does not wish to interfere with litigation occurring in either country. Importantly, the court does not

28

believe that an order of disentitlement will unduly interfere with the litigation in New Zealand.

After the claimants are disentitled, the government may seek a default judgment in this action. If

this court grants a default judgment and orders forfeiture, that would not be the end of the matter.

Because the assets are located in New Zealand, the government would have to present that order

to the New Zealand courts, which may or may not choose to register an order of forfeiture issued

by this court. The New Zealand Criminal Proceeds (Recovery) Act of 2009 ("CPRA") provides

the procedure for registration of foreign forfeiture orders in New Zealand. Section 148 of that

Act provides that:

> A person who claims an interest in property sought to be forfeited under a foreign
> forfeiture order registered in New Zealand may, before the date that is 6 months
> from the date on which the foreign forfeiture order is registered, apply to the High
> Court for an order if the person is a person to whom section 143(2)(a), (b), or (c)
> applies.

CPRA 2009 (NZ).

Section 143(2) provides that Section 148 is applicable if a person:

> (a)in a case where the foreign forfeiture order was made without a hearing in a
> court in the foreign country where it was made, was given no opportunity to make
> representations to the person or body that made the foreign forfeiture order;
>
> (b)in a case where the foreign forfeiture order was made at a hearing of a court in
> the foreign country where it was made, was not served with any notice of, and did
> not appear at, the hearing held in the court;
>
> (c)in any other case, obtains the leave of the court to make the application.

CPRA 2009 (NZ).

If this court after disentitling the claimants were to ultimately order a default judgment of

forfeiture, the New Zealand courts may continue to litigate the issue of whether the assets will

be forfeited. Thus, this court believes that disentitlement of the claimants in the United States

will not unduly interfere with litigation occurring in New Zealand.

29

There is some evidence that the Hong Kong courts are also adjudicating issues concerning the restraint of the assets, primarily bank accounts located in Hong Kong. However, there is no evidence before this court that civil actions have been filed in Hong Kong against the claimants such that the Hong Kong courts are exercising jurisdiction over the assets to a comparable extent to the New Zealand courts. On this record, the court cannot conclude that disentitlement of the claimants would interfere with litigation occurring in Hong Kong.

## VI. CONCLUSION

For the foregoing reasons, the court hereby ORDERS that the government's motion to strike (Dkt. No. 39) is GRANTED and all claimants are disentitled from litigating the civil forfeiture complaint pursuant to 28 U.S.C. § 2466. Accordingly, the court hereby strikes and dismisses the claims of Finn Batato; Julius Bencko; Kim Dotcom; Sven Echternach; Bram van der Kolk; Mathias Ortmann; and Megaupload Limited, Megapay Limited, Megamedia Limited, Megastuff Limited, and Vestor Limited. (Dkt. Nos. 3-9). Because the court has disentitled the claimants, the court also strikes and denies their motion to dismiss the forfeiture complaint or in the alternative stay the forfeiture action. (Dkt. No. 19).[22]

Date:   February __ , 2015
        Alexandria, Virginia


                                        _____/s/_____
                                        Liam O'Grady
                                        United States District Judge

---

[22] The motion to dismiss and/or stay the forfeiture action is not dismissed with respect to Mona Dotcom, a claimant who is also a party to that motion. The court has not yet ruled on the government's motion to strike Mona Dotcom's claim. (Dkt. No. 60).