## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>-v-<br><br>ALL ASSETS LISTED IN ATTACHMENT A, AND<br>ALL INTEREST, BENEFITS, AND ASSETS<br>TRACEABLE THERETO,<br>Defendants *in rem*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 1:14-cv-969<br><br>Hon. Liam O'Grady |

### MEMORANDUM OPINION

This matter is before the court on plaintiff's motions for default judgment and forfeiture. (Dkt. Nos. 85, 96, 97). The government filed a verified complaint for civil forfeiture *in rem* on July 29, 2014 seeking forfeiture of the assets listed in Attachment A to the complaint. (Dkt. No. 1). The subject property is located in Hong Kong and New Zealand and was seized pursuant to restraining orders issued by this court and registered in foreign courts.[1] On August 28, 2014, claims to the assets were filed by Finn Batato ("Batato"); Julius Bencko ("Bencko"); Kim Dotcom ("Dotcom"); Sven Echternach ("Echternach"); Bram van der Kolk ("van der Kolk"); Mathias Ortmann ("Ortmann"); and Megaupload Limited, Megapay Limited, Megamedia Limited, Megastuff Limited, and Vestor Limited ("the corporate claimants"). (Dkt. Nos. 3-9). By order dated February 27, 2015, this court granted the government's motion to strike those claims pursuant to the fugitive disentitlement statute, 28 U.S.C. § 2466. (Dkt. No. 82).

---

[1] The full factual background of this case is discussed in the court's Memorandum Opinion dated February 27, 2015. (Dkt. No. 81).

Mona Dotcom, the estranged wife of Kim Dotcom, also filed a verified claim to certain of the assets listed in attachment A on September 1, 2014. (Dkt. No. 14). On December 30, 2014, the government moved to strike Mona's claim to the assets on the ground that she lacked standing. On March 13, 2015, this court granted the motion in part, finding that Mona lacked standing to challenge the forfeiture of the assets listed in attachment A with the exception of two items of property.[2] The government has excluded these two items of property from its renewed motions for default judgment.

On October 10, 2014, all of the claimants filed a motion to dismiss and or stay the government's forfeiture action. (Dkt. No. 19). This motion has been denied as to the disentitled fugitive claimants, and as to Mona with respect to all property in attachment A except Vehicle 14 and Property 2.

## I. STANDARD OF REVIEW

Rule 55 of the Federal Rules of Civil Procedure and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions are applicable to this civil forfeiture action. *See United States v. $85,000 in U.S. Currency*, No. 10-371, 2011 WL 1063295, at *1 (D. Md. Mar. 21, 2011). Supplemental Rule G(4)(a) provides that a judgment of forfeiture "may be entered only if the government has published notice of the action within a reasonable time after filing the complaint or at a time the court orders." Supp. R. G(4)(a)(i). The notice must describe the property with reasonable particularity and state the time to file a claim and to answer. Supp. R. G(4)(a)(ii). The notice may be posted "on an official internet government forfeiture site for at least 30 consecutive days." Supp. R.G. (4)(a)(iii) (B). If the criteria for notice are met, as they are here, the entry of default judgment is a matter committed

---

[2] The court found that Mona does have standing to contest forfeiture of Vehicle 14 and Property 2 as identified in the Memorandum Opinion.

to the discretion of the trial court. *See Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (citation omitted); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (citing *Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002)).

Federal Rule of Civil Procedure 55 permits the court to grant a motion for default judgment where the well-pled allegations of the complaint establish plaintiff's entitlement to relief, and where a defendant has failed to plead or defend as provided by the rules. *See Music City Music v. Alfa Foods, Ltd.*, 616 F. Supp. 1001, 1002 (E.D. Va.1985); Fed. R. Civ. P. 55.  In the civil forfeiture context, default judgment is permitted where no potential claimant has filed a response to the complaint. *See United States v. All Funds on Deposit in Four Swiss Bank Accounts...and All Proceeds Traceable Thereto*, No. 1:11-cv-118, 2011 WL 7102568, at *2 (E.D. Va. Oct. 26, 2011) (Report and Recommendation) (citations omitted).

A defendant in default, and a claimant who fails to assert a claim *in rem*, is deemed to have admitted all of the plaintiff's well-pled allegations of fact, which then form the basis for judgment in the plaintiff's favor. *See Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (citation omitted). *See also Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 341 (4th Cir. 2006) (stating that default has effect of admitting factual allegations in complaint); Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied"). "It remains, however, for the court to determine whether these unchallenged factual allegations constitute a legitimate cause of action." *See United States v. One 2003 Mercedes Benz CL500*, No. 11-3571, 2013 WL 3713903, at *4 (D. Md. Oct. 3, 2013) (quoting *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010)).

3

Civil forfeiture complaints must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). At trial, the government is required to prove by a preponderance of the evidence that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c). Accordingly, the government must state sufficient facts to support a reasonable belief that it will be able to prove forfeitability by a preponderance of the evidence. *See United States v. 2003 Mercedes Benz CL500*, No. 11-3571, 2013 WL 5530325, at *2 n.4 (stating that the government was not required to establish the forfeitability by a preponderance of the evidence to seek a default judgment. Rather the government had state sufficient facts to support a reasonable belief that it would be able "to prove forfeitability *at trial* by a preponderance of the evidence) (emphasis in original).

## II. DISCUSSION

The government's first claim for relief in the forfeiture complaint seeks forfeiture under 18 U.S.C. § 981(a)(1)(C).[3] Pursuant to § 981(a)(1)(C), the government may obtain a decree for forfeiture of property that "constitutes or is derived from proceeds traceable to…any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7)(D) defines "specified unlawful activity" as, among numerous other offenses, a violation of 18 U.S.C. § 2319. 18 U.S.C. § 1956(c)(7)(D). Section 2319 sets forth the penalties for a violation of 17 U.S.C. § 506(a)(1), which criminalizes infringement of a copyright (A) for commercial advantage or private financial gain; (B) by reproducing or distributing infringing copies of copyrighted works with a value of over $1,000 in any 180-day period; or (C) by distributing a

---

[3] The complaint also alleges that the assets are subject to forfeiture pursuant to § 981(a)(1)(C) and 18 U.S.C. § 2323 because the assets are traceable to violations of 18 U.S.C. § 2319; and pursuant to § 981(a)(1)(A) as property traceable to or involved in a money laundering offense in violation of 18 U.S.C. §§ 1956 and 1957. It is unnecessary to consider these arguments because the court finds that the complaint sufficiently alleges grounds for forfeiture based on the conspiracy.

4

work being prepared for commercial distribution if the person knew or should have known that the work was intended for commercial distribution. 17 U.S.C. § 506(a)(1).

In order to establish a conspiracy under 18 U.S.C. § 371, the government must show "(1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy." *United States v. Jackson*, No. 13-cr-129, 2013 WL 3197069, slip op. at *5 (E.D. Va. June 20, 2013) (citing *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997). The forfeiture complaint alleges that from at least September 2005 until about January 20, 2012, disentitled claimants Dotcom, Batato, Bencko, Echternach, Ortmann, van der Kolk, Megaupload Limited, and Vestor Limited participated in a conspiracy to commit criminal copyright infringement in the Eastern District of Virginia and elsewhere.[4] Complaint at ¶ 17. This court has already considered the sufficiency of the conspiracy allegations in the context of subject matter jurisdiction. *See* Mem. Op. at 5-9 (Dkt. No. 81). However, in determining subject matter jurisdiction, the court did not specifically examine the question of whether there are sufficient allegations to support the inference that there is a "substantial connection" between the assets and the alleged criminal activity. *See United States v. 2003 Mercedes Benz CL500b*, 2013 WL 3713903 at *4; *United States v. All Funds on Deposit in Four Swiss Bank Accounts...*, 2011 WL 7102568, at *3 (E.D. Va. Oct. 26, 2011) (citing *United States v. $3,000 in Cash*, 906 F. Supp. 1061, 1065 (E.D. Va. 1995)). *See also* 18 U.S.C. § 983(c)(3). The court will now make that determination in assessing the government's motion for default judgment.

---

[4] Dotcom served as Chief Executive Officer of Megaupload Limited and later "Chief Innovation Officer" of the company. He was allegedly the head of the conspiracy. Megaupload Limited was the registered owner of Megaupload.com and Megaclick.com. Vestor Limited was the sole shareholder of the parent companies that owned Megavideo.com and other Mega websites. Allegedly, Batato was the Chief Marketing and Sales Officer for the Mega businesses; Bencko was the Graphic Director; Echternach was the Head of Business Development; Ortmann was the Chief Technical Officer; and van der Kolk was the "Programmer-in-Charge." Complaint, ¶¶ 7-15. Additionally, another individual named Andrus Nomm was indicted. He was Head of the Development Software Division for Megaupload Limited and he pled guilty to conspiracy to commit copyright infringement on February 13, 2015. Case No. 1:12-cr-003.

In cases involving "unlawful activities," such as those allegedly pursued by the conspirators, the civil forfeiture statute provides that "proceeds" means "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). The statute thus broadly treats as "proceeds," in this case, any "property" that was "obtained directly or indirectly[ ] as the result of the commission" of the alleged conspiracy to commit copyright infringement.[5] Property constitutes forfeitable proceeds if it would not have been received "but for" the occurrence of the illegal activities giving rise to the forfeiture. *See United States v. Farkas*, 474 F. App'x 349, 359-360 (4th Cir. 2012) (affirming district court's judgment that proceeds would not have been received but for fraud). *See also United States v. Ivanchukov*, 405 F. Supp. 2d 708, 712-13 (E.D. Va. 2005) (adopting a "but for" nexus test for illegal proceeds under the criminal forfeiture statute and noting the test's use in several other circuits); *United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) (holding that under § 981(a)(2)(A), "proceeds are property that a person would not have but for the criminal offense" (internal quotation marks, citation, and alteration omitted)).

### *The Conspiracy Allegations*

The forfeiture complaint alleges that every time an Internet user uploaded a file, including infringing files, to the Megaupload website, the site reproduced the file on at least one computer server controlled by the Mega Conspiracy and provided the uploading user with a

---

[5] Section 981(a)(2)(B) provides another definition of proceeds: "In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs." 981(a)(2)(B). Even if this definition applied, the claimants would have the burden to prove costs. "If the claimant fails to prove direct costs, the government can forfeit the entire amount." *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 208 (D.D.C. 2014) (citation omitted). Here, there are no claimants to the property at issue as discussed above.

uniform resource locator ("URL") link allowing anyone with the link to download the file. Complaint, ¶ 18. Files uploaded by non-premium users were deleted if the files were not downloaded within a certain time frame. Superseding Indictment ("Indictment"), ¶ 7.[6] In other words, only relatively popular files uploaded by non-premium users could remain on the website. By contrast, when a popular file was uploaded by any type of user (premium or non-premium), that file remained on Mega-controlled computers and was available for distribution by anyone who could locate an active link to the file. *Id.* When an Internet user clicked on a Megaupload.com link, the user was typically brought to a download page for the file. *Id.* at ¶ 9. The download page contained advertisements provided by Mega and encouraged users to purchase premium subscriptions to the website. *Id.* at ¶¶ 9-10. Videos could be viewed on Megavideo.com, owned by the Mega Conspiracy.

The complaint identifies premium subscriptions and online advertising as the conspiracy's two primary sources of revenue. Indictment at ¶ 4. The government's theory is that the conspiracy was designed to attract viewers who wished to view infringing content through the links provided by the Mega websites. Premium subscriptions to the Mega websites allowed Internet users to receive payments for uploading and advertising popular content, view videos with fewer wait and download times, upload and download videos with few, if any limitations, and watch movie-length videos without interruptions. Complaint at ¶ 38. Subscriptions to Megaupload.com could be purchased for approximately a few dollars per day or as much as $260 for a lifetime. Indictment at ¶ 4. The complaint states that the conspiracy made over $150 million in subscription fees collected from premium users. *Id.*

One of the key limitations on non-premium users was that they could only watch 72 minutes of video at a time on Megavideo.com. Indictment at ¶ 18. In order to watch videos for a

---

[6] The complaint incorporates by reference the allegations in the superseding indictment. Complaint at ¶ 16.

duration exceeding 72 minutes, non-premium users were required to wait a certain amount of time. Since motion pictures are typically longer than 72 minutes, this model created an incentive for viewers interested in watching films on the Megavideo site to become premium users. Users interested in viewing multiple episodes of television shows would also have an incentive to pay for a premium subscription. Other limitations on non-premium users included increased time to download content and at times the inability to download files over a certain size. Indictment at ¶ 10; Complaint at ¶ 38.

According to the government, viewers watching non-infringing videos would have little reason to purchase premium subscriptions. For example, the indictment references an email from a non-premium user that Dotcom forwarded to Ortmann and Echternach. The email stated that the customer needed to "find a new hobby because watching pirated material via [M]egavideo is now over-rated and ruined because of this video bandwidth limit." Indictment at ¶ 73iii. The limitations on access of non-premium members to the content available on the Mega sites would not have been particularly relevant to Internet users who wished only to view non-infringing content. By contrast, users who wanted to access copyrighted material would have a strong incentive to either upgrade to premium membership or discontinue using the Mega websites.

The other source of revenue for the conspiracy was advertising fees. Before any video could be viewed on Megavideo.com, users had to first view an advertisement. Indictment at ¶ 19. Originally, the Mega sites contracted with other companies to provide advertising. Eventually, a website called "Megaclick.com" was established to set up advertising campaigns for all the Mega sites. *Id.* The government estimates that the conspiracy received over $25 million in online advertising revenues. *Id.* at ¶ 4.

The indictment lists numerous specific copyrighted materials that could be accessed from Mega website links.[7] The government has also presented communications in which the conspirators requested links to particular copyrighted materials. For example, Bencko sent an email asking van der Kolk to find links "again" to the copyrighted television show "The Sopranos." Indictment at ¶ 73gg. Bencko also sent van der Kolk an email requesting Megaupload links to the copyrighted series "Seinfeld". *Id.* at ¶ 73kk. The indictment also contains communications from users of the Mega websites to the conspirators referencing links to infringing files. On or about November 23, 2008, Dotcom received an email from a user complaining about the quality of videos that he or she was trying to watch of the copyrighted series "Dexter." *Id.* at ¶ 73jjj. The user had evidently accessed the Mega link from a referrer site. Dotcom forwarded the email to Ortmann, saying that they needed to solve the quality issue "asap" given that Dotcom had seen complaints about their video quality on many online forums. *Id.* On November 15, 2010, Batato forwarded an email from a customer to Ortmann. The email stated that the user had just paid for Mega's services and requested assistance in accessing episodes of a copyrighted television show, "Robin Hood." *Id.* at ¶ 73llll. The user asked for his or her payment to be canceled if the issue could not be resolved. On August 11, 2011, Dotcom forwarded an email to Ortmann from a user who stated that he or she used to pay a monthly fee for Mega's services to watch television shows such as "Trueblood" and "Battlestar Gallactica." *Id.* at ¶ 73iiiii. The user wrote, "I don't mind your services be[ing] bogged down from time to time. I don't mind paying, but [I] need to get something for the service [I] pay for." *Id.*

The conspirators also allegedly took affirmative steps to conceal their illegal activity. They excluded infringing files from the "Top 100" list, which purported to list the most

---

[7] *See, e.g.,* Indictment at ¶¶ 73r, s, u, nn, bbb, ddd, eee, fff, jjj, kkk, uuu, hhhh, jjjj, nnnn, tttt, vvvv, xxxx, aaaaa, ccccc, jjjjj, kkkkk, mmmmm, rrrrr, sssss.

frequently downloaded files on Megaupload.com. Complaint at ¶ 32. According to the government, an accurate list would have consisted almost entirely of infringing content, so the conspirators "carefully curated" the list to make the site look more legitimate. *Id.* The government alleges that van der Kolk instructed an employee via email that the Top 100 list should contain only non-copyrighted files. Indictment at ¶ 73bbbb. He further instructed the employee to create fake accounts on the Megaupload and Megavideo sites to upload the files, making it appear that these files were uploaded by users rather than members of the conspiracy. *Id.*

The government alleges that the Mega Conspiracy intentionally relied on thousands of third party "linking" or "referrer" websites in order to conceal the scope of the infringement conspiracy. *Id.* at ¶ 11. The referrer sites contained user-generated postings of links to files stored on Mega's servers. Although the conspiracy did not operate the third party websites, the links were created by the Mega websites and the files were stored on Mega's servers. The *links* directed users to Mega download pages to view the requested files. Further, the conspirators sometimes instructed customers to visit referrer sites to access Mega-created links to infringing content. *Id.* at ¶ 14. For example, in January 2010, Batato responded to a user email asking where to find links to full movies. He told the user to go to Mega's "referrer sites…[t]here are the movie and series links. You cannot find them by searching on [Megavideo] directly. That would cause us a lot of trouble ;-)." *Id.* at ¶ 73dddd.

Additionally, the content available from Megaupload.com was not publicly searchable on the website, although the members of the conspiracy could search for the Mega-created links on their websites and the files stored on their servers. *Id.* at ¶ 15. The content on the Megavideo site purported to allow users to search for files. However, the government alleges that the

conspirators developed software to automatically mark all videos longer than 10 minutes—which would include virtually all commercial movies and television shows—as "private" to ensure that the videos would not be searchable or publically displayed on the front pages of Megavideo. Complaint at ¶ 33. These videos could only be located by members of the public through referrer sites.

### The PayPal Account

The conspirators allegedly used a PayPal, Inc. account to receive payments for premium subscriptions and to make payments for operating expenses. The PayPal account allegedly received "in excess of $110,000,000 from subscribers and other persons associated with Mega Conspiracy." Indictment at ¶ 42. Users could also pay for access to the Megaupload website through a company called Moneybookers, which operates a similar online payment system to PayPal.

Operating expenses paid out of the PayPal account included payments to Carpathia Hosting, a company that operated many of the servers used by the Mega websites, and rewards payments to uploaders of popular content. *Id.* The government alleges that the Mega Conspiracy paid over $65 million "to hosting providers around the world for computer leasing, hosting, bandwidth, and support services." *Id.* at ¶ 73f. Under the Uploader Rewards program, the conspirators paid certain users who uploaded popular files. *See, e.g.,* Indictment at ¶¶ 73g, pp, qq, ppp, qqq, www, xxx. Rewards payments allegedly occurred from September 2005 until July 2011. An email from van der Kolk to Ortmann indicates that the conspirators were aware that they paid users who uploaded "copyrighted" and "illegal" files. Indictment at ¶ 73y. Between 2010 and 2011, PayPal sent Megaupload over 145 takedown notices referencing over 3,400 infringing links containing materials that had been downloaded nearly 800,000 times.

Complaint at ¶ 41. Ortmann allegedly assured Paypal that the infringing files had been removed or deleted and that 220 of the 330 registered users who uploaded the files had been blocked from the Mega websites. *Id.* The government claims that in reality, none of the infringing files were deleted, and as of January 19, 2012, the day before the conspirators were arrested, only about 18 of those 220 registered users had actually been blocked from the Mega websites. *Id.*

Further, when copyright holders complained that the Mega sites were infringing their material, the conspirators allegedly responded with false representations that the files had been removed and the users uploading the infringing material had been blocked. Indictment at ¶¶ 73ff, hh, ii. In actuality, the conspirators only removed particular links to the files. Complaint at ¶¶ 26-29. The actual infringing files remained on the Mega-controlled servers and could be accessed from other links. The conspirators also allegedly falsely represented to copyright holders that the Mega Abuse tool would allow owners of copyrighted material to directly delete files immediately. Indictment at ¶¶ 73ss, xx. Dotcom also instructed his co-conspirators not to delete links "reported in batches of thousands from insignificant" copyright holders, as that caused the Mega websites to lose "significant revenue." Indictment at ¶ 73nnn. He further instructed others not to delete "thousands of links" from a single source "unless it comes from a major organization in the US [sic]." *Id.* at ¶ 73ooo.

The PayPal account directly received the proceeds of the alleged conspiracy. Given that the account received payments from premium subscription users and advertising revenues, the government has provided sufficient allegations at this stage that the funds in the PayPal account would not have been received but for the conspiracy to commit copyright infringement. The government reasons that users primarily chose to pay for premium subscriptions in order to view infringing content. Although the complaint concedes that it was "theoretically possible" that

some users purchased premium subscriptions in order to view only non-infringing content, the government argues that there was little incentive for such users to purchase premium subscriptions given the Mega business model. Complaint at ¶ 39. Noninfringing materials, such as user-created home videos, were unlikely to be longer than 72 minutes in length. Moreover, the government offers evidence that the conspirators did not seek out non-infringing viewers for financial gain. For example, van der Kolk allegedly told Ortmann that " 'legit users' were not a source of revenue to the Mega Conspiracy, stating 'that's not what we make $ with :).' " *Id.* Van der Kolk also allegedly told Ortmann that "more than 90%" of the Mega Conspiracy's "profit" was derived from "infringing files." *Id.* On November 21, 2009, Ortmann told van der Kolk that Megavideo's public videos "could not possibly have generated any significant payments." *Id.*

The government has alleged sufficient facts to support a reasonable belief that the Mega websites were designed to distribute, reproduce, and facilitate access to copyrighted materials. With respect to advertising revenues, the popularity of the infringing content enabled the conspiracy to generate fees from advertisers. Since the most popular content on Megaupload.com was allegedly copyright-infringing material, the advertising fees likely would not have been received but for the conspiracy to commit infringement. With respect to the premium subscription fees, it is likely that the fees were overwhelmingly and perhaps only paid by customers viewing infringing content. At this point, the government need only allege enough facts to support a reasonable belief that it will be able to show at trial by a preponderance of the evidence that the money in the PayPal account would not have been received but for the alleged conspiracy to commit copyright infringement and the acts committed in furtherance of that conspiracy. The court finds that this burden has been met.

Next, the court will analyze the traceability of the assets in attachment A to the PayPal account. Because the government seeks the forfeiture of a large number of assets, certain of the assets are more fully identified in the Attachment to the Memorandum Opinion.

*Bank Accounts*

The government seeks the forfeiture of 18 bank accounts. The DBS 0320 account allegedly was a "funnel account" that received all the proceeds of the conspiracy and transferred those proceeds to other accounts in Hong Kong, New Zealand, and elsewhere. *See* Complaint, ¶ 44. From August 2007 to January 2012, the DBS 0320 account received 1,403 deposits totaling HKD 1,260,508,432.01 from the PayPal account. Complaint at ¶ 45. The DBS 0320 account also received transfers of $280,000 U.S. dollars and 3,980,311 Euro from the Moneybookers account. *Id.* at ¶ 46.

Bank accounts 1-12 and 16-17, identified in the attachment to this opinion, all received transfers from the DBS 0320 account. Account 13 received transfers from Account 9, which in turn received transfers from the DBS 0320 account. Accounts 14-15 received transfers from the DBS 0320 account and Account 4, which also received transfers from the DBS 0320 account.

Because these accounts are traceable to the PayPal account, the court finds that there are sufficient allegations to support the forfeitability of the funds in these accounts as proceeds of the conspiracy to commit copyright infringement.

*Financial Instrument*

The government seeks the forfeiture of one financial instrument. The Computershare account held in the name of Kim Dotcom holds government bonds with a face value of 10 million NZD, generating 6% interest annually and set to mature on or about April 15, 2015. *Id.* at ¶ 71. On November 10, 2010, 70 million HKD was transferred from Bank Account 1 to the

ANZ 1200 account.[8]   Five days later, 10,639,321.02 NZD was transferred from the ANZ 1200 account to the Computershare account for the purchase of the bonds. *Id.* at 71-72.  Bank Account 1 contains funds constituting proceeds of the conspiracy, as discussed above.  Because the funds used to purchase the bonds are traceable to the conspiracy, the court finds that there are sufficient allegations to support the forfeitability of this financial instrument as proceeds of or property traceable to the conspiracy.

### *Real Property*

The government seeks the forfeiture of the real property located at 5G the Prom, Coatesville, which is owned by Kim Dotcom.  This property was purchased on or about November 19, 2011, together with a neighboring parcel, for a total of 4,333,000 NZD using funds from Bank Account 15. *Id.* at ¶ 76a.  Because Bank Account 15 constitutes proceeds of the conspiracy as discussed above, this real property is also subject to forfeiture as property traceable to the conspiracy.

### *Vehicles*

The government seeks the forfeiture of multiple vehicles purchased with funds from the above-listed bank accounts.  Vehicles 1-8 were purchased using funds from Bank Account 14. Vehicles 9-16 were purchased using funds from Account 16.  Vehicles 17-18 were purchased using funds from Account 17.  All of these vehicles are thus forfeitable as property traceable to the alleged conspiracy.

The government also seeks the forfeiture of two vehicles that are not explicitly traced to any of the above-listed bank accounts.  Both vehicles were purchased in May 2011 by van der Kolk, who allegedly had no other income during that time period.  These vehicles are also

---

[8] The government does not seek the forfeiture of the ANZ 1200 account.

forfeitable because the government's allegations raise the plausible inference that the money used to purchase the vehicle is traceable to van der Kolk's role in the conspiracy.

*Miscellaneous*

The government seeks the forfeiture of various miscellaneous items of property traceable to the bank accounts discussed above. Four jet skis were purchased using funds from Account 14. Two sharp 108" LCD TV screens, three Samsung 82" LCD TVs, one Devon works time piece, and an artwork were purchased using funds from the DBS 0320 account. These items are therefore forfeitable as property traceable to the proceeds of the conspiracy.

## III. CONCLUSION

For the reasons discussed above, the government's motions for default judgment are GRANTED. The defendant assets are hereby forfeited to the United States.

Date:   March 25, 2015
        Alexandria, Virginia

                                 /s/
                             Liam O'Grady
                             United States District Judge